DA 11-0713

FILED

February 12 2013

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 29

DENNIS STOKES, as Personal Representative
of the Estate of Peter Andrew Carter,

Plaintiff and Appellant,

v.

FORD MOTOR COMPANY, OVERLAND
WEST, INC., and TODD DURHAM,

Defendants, Appellees and Cross-Appellant.

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 05-1236
Honorable Russell C. Fagg, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Dennis P. Conner; Conner & Pinski, PLLP; Great Falls, Montana

Daniel B. Bidegaray; Bidegaray Law Firm, LLP; Bozeman, Montana

For Appellees:

Neil G. Westesen; Ian McIntosh; Crowley Fleck, PLLP; Bozeman,
Montana (Ford Motor Company)

Lee A. Mickus; Vaughn A. Crawford; Snell & Wilmer, LLP; Denver,
Colorado (Ford Motor Company)

Guy W. Rogers; Jon A. Wilson; Brown Law Firm, P.C.; Billings, Montana
(Overland West, Inc.)

Submitted on Briefs: November 14, 2012

Decided: February 12, 2013

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    Appellant Dennis Stokes (Stokes), personal representative of the estate of Peter Andrew Carter (Carter), appeals the jury verdict and judgment of the Thirteenth Judicial District Court concluding that Ford Motor Company (Ford) and Overland West, Inc. (Overland) were not liable in strict products liability or negligence in Carter's death. We affirm.

¶2    We consider the following issues on appeal:

¶3    *1.    Whether the District Court erred by denying Stokes' motion for default judgment on liability as a sanction against Ford for withholding evidence of other incidents?*

¶4    *2.    Whether the District Court erred by excluding Stokes' proffered evidence of other incidents?*

¶5    *3.    Whether the District Court erred by excluding evidence related to Ford's actions in making the Safety Canopy System a standard feature in some other countries in 2002 and in the United States in 2007, and by permitting Ford to present an improper "consumer-choice" defense?*

¶6    *4.    Whether the District Court erred by excluding the indemnity agreement between Ford and Overland and limiting questioning about the agreement and these parties' prior adversarial position?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶7    On November 2, 2002, Peter Andrew Carter, a resident of Australia, rented a "2002.5" or mid-year model Ford Explorer at Overland's Bozeman airport location after flying to Montana for a work-related visit. On November 7, Carter was driving on Highway 287 near Ennis when Todd Durham (Durham) executed a left-hand turn of his vehicle in front of Carter, leading to a collision. Carter's Explorer was traveling between

2

76 and 83 miles per hour, and the impact caused the vehicle to roll five times across a distance of 286 feet. Although Carter's passenger survived, Carter was partially ejected and killed. Dennis Stokes, personal representative for Carter's estate, filed a wrongful death and survival claim against Ford, Overland, and Durham on November 3, 2005. The complaint alleged that the Defendants were responsible for Carter's death under strict products liability and negligence theories.

¶8    Stokes claimed that safer alternative designs to protect the driver during rollover were "both technically and economically feasible," including a Safety Canopy System (SCS), which first became available three months before the subject Explorer was manufactured and was offered as an optional feature for 2002.5 model Explorers. SCS technology was not installed in the Explorer that Carter was driving. Overland, a Hertz Corporation licensee, purchased its fleet of vehicles from Ford.[1] Ford claimed that Overland chose not to equip its fleet of Explorers with the optional SCS, and Stokes claimed Overland was negligent in so doing. Ford and Overland ultimately entered into an indemnity agreement and thereafter presented a united position in the litigation. Ford defended by asserting that, even without the SCS technology, the 2002.5 Explorer was a safe vehicle that exceeded all safety standards.

¶9    Numerous pretrial motions were filed by the parties regarding discovery of evidence of other accidents, evidence regarding the standardization of SCS technology in Ford Explorers, the indemnity agreement between Ford and Overland, and the use of

---

[1] Hertz was a subsidiary of Ford in 2002.

3

such evidence at trial.  A ten-day jury trial was held between September 6 and 19, 2011.  The jury unanimously concluded that Durham was liable in negligence and that Ford and Overland were not liable for Carter's damages.[2]  The District Court entered judgment accordingly, and Stokes appeals.

¶10    Additional facts will be discussed herein.

## STANDARD OF REVIEW

¶11    "A district court has broad discretion in determining whether evidence is relevant and admissible."  *Newman v. Lichfield*, 2012 MT 47, ¶ 22, 364 Mont. 243, 272 P.3d 625 (quoting *Weber v. BNSF Ry.*, 2011 MT 223, ¶ 18, 362 Mont. 53, 261 P.3d 984).  We review a district court's evidentiary rulings for an abuse of discretion.  *Newman*, ¶ 22 (citing *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, ¶ 74, 338 Mont. 259, 165 P.3d 1079).  Likewise, we review a district court's decision to impose discovery sanctions for an abuse of discretion.  *Kraft v. High Country Motors, Inc.*, 2012 MT 83, ¶ 23, 364 Mont. 465, 276 P.3d 908.  A district court abuses its discretion when it acts "arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice."  *Kraft*, ¶ 23 (citations omitted).

## DISCUSSION

¶12    *1.    Whether the District Court erred by denying Stokes' motion for default judgment on liability as a sanction against Ford for withholding evidence of other incidents?*

---

[2] The jury awarded damages to Carter's Estate from Durham in the amount of $1,409,005.  On September 29, 2011, the District Court granted Stokes' motion for new trial against Durham on the issue of damages.

4

¶13 Stokes moved to compel discovery of "other similar incident" information, including evidence about cases where it was alleged that the lack of SCS and other restraint system inadequacies in Explorers and other Ford light trucks led to injuries or death to occupants in rollover accidents. On April 19, 2011, the District Court granted the motion and set discovery criteria for Ford to follow. On May 27, Ford filed a motion for partial relief from the April 19 order. Ford identified more than 1,350 cases meeting the court's criteria and argued that it would cost "over $2 million with respect to the production of Ford's outside counsel files alone," involving more than 60 law firms employed by Ford. On June 29, 2011, the District Court issued an order limiting the scope of this discovery to Ford's internal case files, data already collected by Ford from outside counsel, preparation of a list of prospective cases with outside counsel, and production of files from a "reasonable number" of cases identified by Stokes that were managed by outside counsel.

¶14 Ford thereafter produced information about other incidents to Stokes on six occasions between June and August of 2011. This discovery consisted of approximately 17 gigabytes of electronic data. On August 12, Ford filed a motion in limine regarding other incident information, requesting exclusion of "all references, direct or indirect, to other accidents, incidents, claims, complaints and/or lawsuits until Plaintiff lays a foundation of substantial similarity, outside the presence of the jury." On August 15, Stokes moved for default sanctions against Ford for failure to comply with the District Court's June 29 discovery order. That same day, Ford provided an additional 300

gigabytes of electronic data about other incidents. In his response to Ford's motion in limine, Stokes again requested default sanctions because Ford had produced "more than 10 times the evidence that had previously been produced less than a month before trial."[3]

¶15 At a hearing on August 24, the District Court addressed Stokes' motion for default sanctions:

> I know the Plaintiff would like the Court to enter judgment on liability, because the Plaintiff argues Ford has vocally disregarded the court's orders regarding discovery. I think there is no doubt there have been problems with discovery; I'm not saying Ford has done the best job possible, but I think they tried, and I don't think the default sanction is appropriate.
>                         .    .    .
>        Don't let my denial of the motion – don't let that give you the idea that I'm not frustrated with Ford, because I am. I'm just not clear that Ford has wantonly disregarded the order of the Court or intentionally tried to slow down discovery here. I just have to believe that a company of Ford's significance, and all the litigation that it's in – that it doesn't have a more streamlined process for producing discovery. I mean, here we are dumping all this information on Plaintiff's counsel on August 15, which is about three weeks before trial. I'm not happy about it; I'm just not convinced that it rises to the level of default sanctions. I want to be clear that if I get the idea as this thing goes along, or if when trial starts, that Ford is playing games, this can be revisited.

The District Court also denied Ford's motion in limine regarding other incidents, but directed that "Plaintiff will have to lay a foundation of substantial similarity to introduce this type of evidence in the trial."

¶16 Stokes did not request a continuance of the trial date, stating in his briefing, "Plaintiff does not want a continuance. Plaintiff wants this matter tried. Plaintiff and

---

[3] On August 1, 2011, this Court issued a writ of supervisory control reversing the District Court's order of March 17, 2011, which had granted Ford's motion in limine to prohibit admission of evidence of Carter's seatbelt use. *See Stokes v. Thirteenth Jud. Dist. Ct.*, 2011 MT 182, ¶ 27, 361 Mont. 279, 259 P.3d 754.

6

several Australian witnesses have plane tickets purchased for the trial." Stokes renewed his request for sanctions at trial, stating, "because of the late discovery from the Defendants, . . . we were not able to put on a substantial [other incident] case." The District Court again denied the request.

¶17 On appeal, Stokes argues that "a defendant's late disclosure of critical [other incident] evidence which prejudices a plaintiff's ability to present its case justifies entry of default judgment on liability." Stokes requests that this Court reverse the District Court's denial of sanctions, noting our statement in *Richardson v. State*, 2006 MT 43, ¶ 56, 331 Mont. 231, 130 P.3d 634, that courts "must remain intent upon punishing transgressors rather than patiently encouraging their cooperation." Ford responds that the cases in which default judgment has been imposed as a sanction for withholding evidence illustrate that the non-complying parties acted willfully and in bad faith, blatantly concealed relevant information, or demonstrated a flagrant disregard of court orders and discovery rules. Ford argues the District Court properly refused Stokes' motions because it found "no evidence of bad faith or non-responsiveness" and that Ford "complied fully with the court's mandates."

¶18 Rule 37(b)(2), M. R. Civ. P.,[4] authorizes a district court to sanction a party for failure to comply with a court order compelling discovery, including by dismissal of an action or by entering a judgment by default. In a case involving entry of a default

---

[4] The Montana Rules of Civil Procedure were revised effective October 1, 2011. Because the District Court's orders on appeal predate the amendments to the Rules, any references herein to the M. R. Civ. P. refer to the 2009 version of the Rules.

7

judgment as a sanction, we explained that sanctions are appropriate "where counsel or a party has acted willfully or in bad faith in failing to comply with the rules of discovery or with court orders enforcing the rules, or they have acted in flagrant disregard of those rules." *Kraft*, ¶ 37 (citing *Jerome v. Pardis*, 240 Mont. 187, 192, 783 P.2d 919, 922 (1989)). The party requesting the entry of a default judgment as a sanction for discovery abuse must show prejudice. *See Eisenmenger v. Ethicon, Inc.*, 264 Mont. 393, 406, 871 P.2d 1313, 1321 (1994); *Estate of Willson v. Addison*, 2011 MT 179, ¶ 28, 361 Mont. 269, 258 P.3d 410; *Anderson v. Werner Enters., Inc.*, 1998 MT 333, ¶ 13, 292 Mont. 284, 972 P.2d 806 ("[T]he party assigning error to the trial court's discovery rulings must show prejudice."). "The trial judge is in the best position to know . . . which parties callously disregard the rights of their opponents and other litigants seeking their day in court. The trial judge is also in the best position to determine which sanction is the most appropriate." *Linn v. Whitaker*, 2007 MT 46, ¶ 13, 336 Mont. 131, 152 P.3d 1282 (citing *Xu v. McLaughlin Research Inst.*, 2005 MT 209, ¶ 17, 328 Mont. 232, 119 P.3d 100) (citations omitted).

¶19 In *Richardson*, we held that default judgment was an appropriate sanction where the defendant's "willful and bad faith conduct" amounted to a "blatant and systemic" abuse of the discovery process that "undermined the integrity of the entire proceeding." *Richardson*, ¶¶ 65, 68. The defendant had knowingly "concealed the evidence . . . until the eve of trial by asserting baseless objections" to plaintiff's discovery requests and attempted to use the lack of knowledge created by the discovery abuses against the

8

plaintiff. *Richardson*, ¶ 23. In contrast to the situation here, the concealed evidence in *Richardson* consisted of one page of significant information concerning the other similar incidents. In *Estate of Willson*, the defendant hospital inadvertently destroyed some medical records that would have otherwise been discoverable in a medical malpractice case. *Willson*, ¶¶ 27-28. We held that the defendant did not "blatantly, systemically, willfully and in bad faith violate the rules of discovery." *Willson*, ¶ 28.

¶20 Here, the discovery issue was complex and the District Court narrowed the scope of discovery and issued discovery criteria on June 29, 2011. Over the course of the following six weeks, Ford produced discovery information on seven separate occasions, with the bulk of information coming on August 15, three weeks before trial. The District Court was unhappy with the process of discovery, but found that Ford had not "wantonly disregarded" its order or had "intentionally tried to slow down discovery here." The record supports the District Court's finding that this was not the "blatant and systematic" discovery abuse that "undermined the integrity of the entire proceeding" at issue in *Richardson*. *Richardson*, ¶ 65. Stokes did not seek a continuance and decided to proceed to trial. We also stated in *Richardson* that "the principle of 'trial on the merits' weighs against the imposition of a default judgment." *Richardson*, ¶ 68 (citing *Schuff v. A.T. Klemens & Son*, 2000 MT 357, ¶ 81, 303 Mont. 274, 16 P.3d 1002). We cannot conclude the District Court abused its discretion in weighing the circumstances and determining not to enter a default judgment against Ford.

¶21 *2. Whether the District Court erred by excluding Stokes' proffered evidence of other incidents?*

9

¶22 During a conference on evidentiary issues conducted outside of the jury's presence, Stokes sought the court's permission to introduce alternative "other incident" evidence that he had independently obtained. The evidence consisted of a compilation of summaries of more than 3,000 crashes and was offered for the purpose of establishing that Ford had actual notice of Explorer rollovers. The compilation had been previously used in an unrelated case known as "the *Turley* case." For foundation, Stokes offered the "Ridenour deposition," which was a deposition taken of a Ford representative in another 2002.5 Ford Explorer rollover case, referred to as "the *Jones* case." Ford objected based on foundation, hearsay, and relevance because the materials had been prepared by a different law firm in a different case, adding "there has to be some base level showing of substantial similarity" to introduce this evidence. Stokes made no offer of proof or testimony to demonstrate "substantial similarity" of the evidence to Carter's case or to otherwise lay a foundation for the evidence. The District Court excluded the evidence.

¶23 Stokes argues that "[w]hile the district court did not rule [other incident] evidence was inadmissible per se, its denial of Stokes' motion for entry of default judgment on liability due to Ford's tardy disclosure forced Stokes to find alternative ways to introduce" such evidence. Stokes suggests that this evidence "should have been held admissible as a minimum sanction for Ford's dilatory discovery actions." Ford responds that Stokes failed to lay a proper foundation for the evidence by an offer of proof that the case for which the case summaries were originally created, the *Turley* case, was substantially similar to this case, or that the individual cases summarized in the proposed

10

compilation exhibit were substantially similar to this case, and Stokes likewise failed to offer any witness involved in the creation of the summarization or to demonstrate that the Ridenour deposition would serve to lay a foundation for a summarization created by others.

¶24 Evidence of other similar instances may be admitted to show notice or knowledge of the existence of a danger or a defect. *Faulconbridge v. State*, 2006 MT 198, ¶ 30, 333 Mont. 186, 142 P.3d 777. "[T]he test of admissibility for evidence of the accidents in a products liability case is 'whether the circumstances surrounding the product involved in other accidents were substantially the same or similar to the accident at issue.'" *Krueger v. General Motors Corp.*, 240 Mont. 266, 274, 783 P.2d 1340, 1345-46 (1989) (quoting *Kuiper v. Goodyear Tire & Rubber Co.*, 207 Mont. 37, 56, 673 P.2d 1208, 1219 (1983)). "The admission of evidence of other accidents in products liability litigation is entrusted to the discretion of the trial judge." *Krueger*, 240 Mont. at 275, 783 P.2d at 1346 (citing *Tacke v. Vermeer Mfg. Co.*, 220 Mont. 1, 9, 713 P.2d 527, 532 (1986)). "A concerted effort should be made by [the trial] court to allow the admission of evidence of only those accidents where both the product and the circumstances surrounding the accident were similar to the case at bar." *Preston v. Eighteenth Jud. Dist. Ct.*, 282 Mont. 200, 208, 936 P.2d 814, 818 (1997) (citations omitted).

¶25 The District Court denied Ford's motion in limine to exclude evidence of other incidents, but properly ruled that Stokes "will have to lay a foundation of substantial similarity to introduce this type of evidence in that trial." Stokes sought to introduce such

11

evidence in the form of the compilation summarizing 3,000 rollover cases, upon a foundation of a Ford representative's deposition in an unrelated case. After Ford's objection, Stokes made no further efforts to demonstrate that his proposed evidence satisfied the requirement of substantial similarity. On this record, we are unable to determine whether Stokes' proposed evidence was similar to Carter's accident and therefore must conclude that the trial court was within its discretion to exclude the evidence.[5]

¶26    3.    *Whether the District Court erred by excluding evidence related to Ford's actions in making the Safety Canopy System a standard feature in some other countries in 2002 and in the United States in 2007, and by permitting Ford to present an improper "consumer-choice" defense?*

¶27    Ford filed motions in limine requesting the court to preclude Stokes from discussing or introducing evidence that Ford made the SCS standard equipment in certain foreign markets in 2002, including Australia, and in vehicles sold in the U.S. in 2007. Ford argued that the evidence of standardization in these markets would be irrelevant, prejudicial, and confusing because it would require mini-trials on the reasons for the timing of market introductions and, with regard to the 2007 U.S. standardization, would constitute a subsequent remedial measure inadmissible under M. R. Evid. 407. The District Court granted the motions.

---

[5] Regarding Stokes' suggestion that the evidence should have been admitted as a sanction, we have cautioned against the admission of "patently inadmissible and substantially prejudicial evidence over objection, as a sanction for a party's failure to comply with a pretrial order." *Stevenson v. Felco Indus.*, 2009 MT 299, ¶ 45, 352 Mont. 303, 216 P.3d 763.

¶28 Stokes makes broadly-stated arguments that the standardization evidence should have been admitted "to rebut and impeach all of Ford's consumer-based and 'migration of technology' arguments," to establish Ford's notice and knowledge of the need for SCS technology, and for Ford's culpability for punitive damages. Stokes argues that the 2007 U.S. standardization was not a subsequent remedial measure, but even if so, the evidence should have been admitted for purposes of "impeachment" and "feasibility of standardization."

¶29 During trial, Stokes again offered the 2002 foreign country standardization evidence in an attempt to impeach the testimony of Douglas Scott, Ford's North America SUV marketing manager, who testified that the 2002.5 Explorer was the first model for which SCS technology had been made available as an option in the U.S. Scott noted that the U.S. SUV market was extremely competitive and that consumers were driven by cost-consciousness. He testified that the 2002.5 Explorer had a "well-documented, well-established record of safety" even without SCS technology, explaining "we had a vehicle that exceeded all of the safety standards. It had a demonstrated record for delivering safety and was affordable, again, for our consumers." The District Court again denied admission of the evidence, reasoning that Scott's only responsibility was for North American markets and that he did not testify or have knowledge about SCS standardization in foreign markets. However, when cross-examining Michael Leigh, a research engineer in Ford's Automobile Safety Office, Stokes was permitted to ask, over Ford's objection, about the standardization of SCS technology in Australia in 2002.

13

Leigh testified that Ford commonly introduced new technology in small markets so that the technology could be analyzed in the field prior to implementation in Ford's entire fleet, including the dominant U.S. market. This also served to ensure that "the customer[s] have a choice, do they want this new technology or not" in a vehicle that Leigh testified was safe with or without SCS technology.

¶30 Regarding the 2007 U.S. standardization, Stokes argues on appeal that this evidence was not a subsequent remedial measure governed by M. R. Evid. 407, as the District Court so ruled. However, Stokes conceded before the District Court that this evidence raised a subsequent remedial issue, and the matter was argued that way. Stokes offered the evidence to impeach what he described as Ford's "consumer demand" testimony, and likewise argues on appeal that the evidence "controverts [Ford's] position that it was waiting until consumers demanded SCS as a standard feature." However, Ford's witnesses did not offer the solitary proposition that Ford delayed employment of SCS technology until consumers demanded it. While consumer interest was one factor about which they testified, other factors such as performance of the new technology in test markets, prioritization of the feature in light of other safety features and the Explorer's high safety ratings, and affordability were also considered. Further, Ford's testimony was given with regard to its analysis at the time the 2002.5 model Explorer was introduced and SCS was first made optional, not about the U.S. standardization in 2007 that Stokes sought to introduce. We recently explained that "subsequent remedial measures are admissible for impeachment purposes where the defendant goes beyond

14

stating that the original condition was safe or adequate and attempts to make exaggerated claims that the condition was the safest possible" and that such evidence must "directly impeach a witness's testimony or other evidence offered by a defendant." *United Tool Rental, Inc. v. Riverside Contracting, Inc.*, 2011 MT 213, ¶ 15, 361 Mont. 493, 260 P.3d 156 (citations and internal quotations omitted). In response to Stokes' offer, the District Court said, "I don't think there's any impeachment here" and reasoned that it was convinced that admission of the evidence "would be a violation of Rule 407."

¶31 After review of the record, we conclude that the District Court's rulings on the 2002 and 2007 standardization evidence as offered by Stokes did not constitute abuses of discretion.

¶32 Lastly, Stokes generally argues that "[t]he district court improperly permitted Ford to pursue a consumer choice defense without allowing Stokes to rebut its position." Stokes did not object to the Ford testimony that he characterizes as "consumer choice" testimony, but rather offered a "delegation" jury instruction in response, which provided: "[a] manufacturer has a duty to design a reasonably safe product and may not delegate such duty to a dealer, user, or purchaser of the product." The District Court denied Stokes' proposed instruction in favor of other instructions. Ford responds that, unlike the cases cited by Stokes in favor of the delegation instruction, it did not place responsibility for product safety on the consumer, but that the jury was instructed to determine whether

the Explorer was safe "at the time of sale by the Defendant" and whether the Explorer was defective pursuant to factors unrelated to consumer choice.[6]

¶33   "A district court's decision pertaining to jury instructions is reviewed for an abuse of discretion.  While the district court's discretion is broad, it is ultimately restricted by the overriding principle that jury instructions must fully and fairly instruct the jury regarding the applicable law."  *Goles v. Neumann*, 2011 MT 11, ¶ 9, 359 Mont. 132, 247 P.3d 1089 (citing *State v. Christiansen*, 2010 MT 197, ¶ 7, 357 Mont. 379, 239 P.3d 949).

---

[6] Instruction 19 stated:
"A product may cause injury because of its design even though it was faultlessly manufactured. In order to recover for such injury, Plaintiff must prove:
    First, at the time of sale by the Defendant, the product was in a defective condition because of its design;
    Second, that the design of the product caused injury to Peter Carter."

Instruction 20 stated:
    "In determining whether the Explorer was defective, you should consider whether an alternative design should have been utilized, in light of:
  1) The likelihood at the time of manufacture that the product would cause the harm suffered by the claimant;
  2) The seriousness of that harm;
  3) The technological feasibility of manufacturing a product designed so as to have prevented claimant's harm;
  4) The relative costs of producing, distributing, and selling such an alternative design; and
  5) The new or additional harms that may result from such an alternative design.
    A product may be in a defective condition if the manufacturer should have used an alternative design.
    In determining whether an alternative design should have been used, you should balance so many of the following factors as you find to be pertinent at the time of manufacture:
  a) The reasonable probability that the product as originally designed would cause serious harm to the claimant.
  b) Consideration of the reasonable probability of harm from the use of the original product as compared to the reasonable probability of harm from the use of the product with the alternative design.
  c) The technological feasibility of an alternative design that would have prevented claimant's harm."

16

After a review of the instructions, we conclude the District Court did not err in fully and fairly instructing the jury regarding the applicable law.

¶34   *4.   Whether the District Court erred by excluding the indemnity agreement between Ford and Overland and limiting questioning about the agreement and these parties' prior adversarial position?*

¶35   Ford's answer to Stokes' complaint raised an affirmative defense that "[a]ll of Plaintiff's injuries were caused by the acts or omissions of third parties and/or Plaintiff and the other Defendants . . . ."  Overland raised a similar defense, stating that "any damages claimed by Peter Carter, his estate and/or his heirs were caused by the wrongful and/or negligent conduct of Todd Durham, Ford and/or parties other than Overland . . . ."  Neither Ford nor Overland filed a cross-claim against the other.  Later, Ford and Overland entered into an indemnity agreement, whereby they withdrew their respective affirmative defenses implicating each other.  Ford initially provided legal representation for Overland after the agreement was entered, although separate counsel later appeared for Overland for the remainder of the proceedings.  The parties are represented separately on appeal.

¶36   Stokes sought admission of the indemnity agreement and, after extensive arguments by the parties, the District Court ultimately determined that the agreement could be addressed at trial, but would not be admitted as documentary evidence, stating, "I don't want the jury to be looking at the Indemnity Agreement . . . .  They wouldn't understand it anyway."  The District Court also excluded the agreement and questioning about Ford and Overland's initial pleadings on the ground that the final pretrial order had

17

superseded the pleadings and had not addressed this issue. Stokes asked the court if, as an alternative to admitting the agreement, it would instruct the jury on the effect of the agreement. The court indicated it would entertain a proposed instruction from Stokes, but none was submitted.

¶37 During trial, Stokes used the agreement in cross-examination of Jeffrey Ralph Heileson, Overland's representative, to demonstrate bias. Stokes' examination established the existence of the agreement and highlighted that, pursuant to the agreement, Ford had selected counsel for Overland, was paying for Overland's defense, and would pay any judgment entered against Overland. Heileson offered, however, that he had not read the entire agreement and was not aware of its details:

> Q [by Stokes' Attorney]. Well, is it true that the agreement provides that if Ford and Overland West no longer have a unity of interest in the defense to this case, Ford, at its sole option, can withdraw from the defense and indemnification of Overland West?
>
> A [by Heileson]. If that's what it says, I guess that's true. But like I said, I didn't know that before you just said it . . . it's not my charge at our company to analyze those types of documents, so I really—and no one has advised me as to what limits I may have and what I could say in my testimony or in answering any discovery questions or anything.

Stokes also referenced the agreement during his opening statement and his closing argument.

¶38 Stokes argues on appeal that the indemnity agreement was admissible as evidence of a compromise under M. R. Evid. 408, which permits admission of such evidence when offered to prove bias or prejudice of a witness. He argues that the ability to introduce the agreement itself and ask questions about the parties' original pleadings was critical to

18

establishing witness bias, particularly with Heileson. Ford argues that the agreement was not relevant, would have caused jury confusion, that Stokes failed to lay the necessary foundation for its admission, and that the District Court properly limited questioning to the terms of the final pretrial order.

¶39 Without addressing all of the parties' arguments, we simply conclude that the District Court's rulings did not constitute reversible error. The court gave Stokes considerable leeway in using the indemnity agreement. Stokes was able to establish the basic terms of the agreement and to well make the point to the jury that Ford and Overland had become allies in the suit. Further effort by Stokes to demonstrate bias on the part of Heileson would necessarily have been limited by Heileson's testimony that he hadn't read the entire agreement, had little knowledge or understanding of the agreement, and had not been advised of any restrictions upon his testimony because of the agreement. We conclude that Stokes was not prejudiced by the District Court's rulings on the issue.

¶40 Affirmed.

/S/ Jim Rice

We concur:

/S/ Mike McGrath
/S/ Beth Baker
/S/ Patricia Cotter
/S/ Brian Morris

19