FILED

May 29 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0257

DA 14-0257

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 148

MARK SPOTTED HORSE,

> Plaintiff and Appellant,

v.

BNSF RAILWAY COMPANY,

> Defendant and Appellee.

APPEAL FROM: District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. BDV 10-421
Honorable Julie Macek, Presiding Judge

COUNSEL OF RECORD:

> For Appellant:

> > James T. Towe, Kimberly L. Towe, Towe & Fitzpatrick, PLLP, Missoula, Montana

> > James Ferguson, Chester H. Lauck, III, Law Office of H. Chris Christy, North Little Rock, Arkansas

> For Appellee:

> > Scott M. Stearns, Christopher L. Decker, Boone Karlberg P.C., Missoula, Montana

> > > Submitted on Briefs: January 14, 2015
> > > Decided: May 29, 2015

Filed:

_____
Clerk

Justice Patricia Cotter delivered the Opinion of the Court.

¶1 Mark Spotted Horse appeals from a jury verdict and judgment rendered in favor of BNSF Railway Company in the Eighth Judicial District Court, Cascade County.

¶2 Spotted Horse presents four issues on appeal. Because we reverse and remand, we need address only two issues, which we restate as follows:

1. *Whether the District Court abused its discretion in declining to grant Spotted Horse's request for a default judgment based on the spoliation of video footage taken at BNSF's Diesel Shop on the day Spotted Horse was injured.*

2. *Whether the District Court abused its discretion when it instructed the jury as to BNSF's duty of care in a FELA action.*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 On April 28, 2010, Mark Spotted Horse, a BNSF Railway Company (BNSF) machinist, filed suit against BNSF alleging negligence under the Federal Employers' Liability Act, 45 U.S.C. §§ 51-60. Spotted Horse claimed that on September 13, 2009, while working in BNSF's Diesel Shop in Havre, Montana, he suffered a disabling injury when his co-worker Jim Syverson inadvertently lowered a locomotive engine compartment hatch on his head. Spotted Horse reported the incident to his BNSF supervisors and was immediately taken to the hospital by BNSF Shop Superintendent Beau Price. Shortly thereafter, Spotted Horse filed an employee injury report indicating that the rope used to lower the engine compartment hatch had slipped through Syverson's hand. According to the injury report, the hatch then struck Spotted Horse on the top of his hard hat causing him to suffer headaches and neck pain.

2

¶4    BNSF General Foreman Paul McLeod immediately commenced to investigate and collect information relative to Spotted Horse's injuries. In coordination with Price and General Electric (GE) Senior Site Manager Rob Wood,[1] McLeod collected Spotted Horse's hard hat, conducted reenactments of the alleged injury, took photographs, and interviewed and obtained written statements from both Spotted Horse and Syverson.

¶5    At the time of the alleged incident, the Diesel Shop had a digital camera recording system in place, which consisted of multiple video cameras positioned at various locations throughout the shop stalls.[2] The video cameras ran continuously, recording 24 hours per day, seven days per week, and generated footage that was viewable real-time on a monitor in the shop supervisor's office.

¶6    For purposes of investigating injuries and rule violations and implementing possible disciplinary actions against employees, BNSF personnel routinely requested copies of video footage by emailing or calling BNSF's Resource Operation Center (ROC), located in Fort Worth, Texas. The ROC administers resource protection, including the preservation of video footage. Absent a video footage request within a specified period of time, typically 15 to 30 days, the digital recording system automatically overwrites old video footage with new video footage.

---

[1]   In the Havre Diesel Shop, BNSF dealt with two brands of locomotives, including GE locomotives. Wood, as Senior Site Manager, was responsible for delivering GE locomotives to BNSF.

[2]   During his deposition on February 28, 2012, McLeod stated that the Diesel Shop had 17 operating video cameras. The record is unclear, however, as to how many video cameras were in operation on the date of Spotted Horse's alleged incident.

3

¶7    Spotted Horse maintains that during a post-incident interview he requested a copy of the video footage from the shop's cameras. Later, after his lawsuit was filed, Spotted Horse made several discovery requests, including a request for the production of videos and photographs of the work area where the alleged injury occurred. According to Spotted Horse, BNSF initially produced three photographs, but it never referenced or provided any video footage. Spotted Horse eventually moved the court for an order to compel BNSF to answer his discovery requests. BNSF responded that McLeod had contacted the ROC to request video footage from the two stalls where Spotted Horse was allegedly injured. However, as stated in BNSF's response, the ROC informed McLeod "that the videos overwrite every 15 to 30 days, therefore any video footage from 9/13/2009 no longer exists." BNSF stated that "[a]fter further inquiry, it was determined that there is no record of the video being requested in September or October 2009" (the six weeks following the accident).

¶8    McLeod subsequently acknowledged in a deposition that he had utilized video recordings for investigations of workers for rule violations as well as in connection with injuries and was aware that the video recording system would overwrite recordings after a certain period of time. McLeod testified that on the evening of the incident, he and Price had "probably watched about 15 minutes" of video footage from one camera located in the stall purportedly closest in proximity to where the alleged injury occurred. According to McLeod, he "[a]bsolutely . . . could have requested" a copy of the video footage. However, McLeod determined "[t]here was no evidence to preserve" because that particular camera did not capture the area where Spotted Horse and Syverson were

4

working nor did the camera show Spotted Horse's alleged injury. McLeod stated that he had not viewed video footage from any other camera in the shop and agreed that other cameras may have captured Spotted Horse and Syverson performing other acts in the shop.

¶9 Likewise, in his deposition, Price stated that he watched video footage "once or twice" with McLeod, but that they "could see nothing there." BNSF indicated that GE representative Wood also viewed the video and had reached the same conclusion.

¶10 Although he did not immediately contact BNSF's claims department regarding the investigation into Spotted Horse's alleged injury, McLeod eventually submitted his findings to BNSF Senior Claims Representative Nancy Ahern. Ahern stated that she was not aware of any BNSF policy that instructs BNSF supervisors to immediately notify the claims department so that evidence can be preserved. However, she stated that if she is apprised of a situation where there is video footage as evidence, she will make a request from ROC. No such request was made here, as BNSF did not make a timely request to preserve any of the video footage from any of the cameras in place at the time of the alleged incident.

¶11 On July 27, 2012, Spotted Horse moved for a default judgment against BNSF on the issues of liability, causation, and contributory negligence based on the alleged spoliation of video footage and other discovery abuses. The District Court denied the motion, but prohibited BNSF from introducing or referring to any testimony or evidence about the video footage unless Spotted Horse first chose to introduce that information. In that event, BNSF would be free to tell the jury what the videos ostensibly showed.

¶12   A jury trial commenced on December 2, 2013.  During trial, both parties presented testimony and evidence regarding the relevancy and unavailability of the video footage.

¶13   Among the jury instructions given, Instruction No. 2 stated, in pertinent part:

> If it appears that a party intentionally or recklessly destroyed or concealed evidence favorable to the other party, then you should view any contrary evidence presented by that party with distrust.

Additionally, over Spotted Horse's objection, the district court provided Instruction No. 11 concerning BNSF's duty of care, which stated the following:

> BNSF was not obligated to eliminate all risks in the work place; it was only obligated to eliminate unreasonable risks.

¶14   On December 10, 2013, the jury found in favor of BNSF and the case was dismissed with prejudice.  Spotted Horse subsequently moved for a new trial, which the District Court denied.  Spotted Horse appeals.

## STANDARDS OF REVIEW

¶15   We review a District Court's decision to impose or decline to impose sanctions for an abuse of discretion.  *Schuff v. A.T. Klemens & Son*, 2000 MT 357, ¶ 26, 303 Mont. 274, 16 P.3d 1002.  In doing so, we generally defer to the district court because it is in the best position to determine both whether the party in question has disregarded the opponent's rights, and which sanctions are most appropriate.  *Richardson v. State*, 2006 MT 43, ¶ 21, 331 Mont. 231, 130 P.3d 634.  In determining whether the trial court abused its discretion, the question is not whether the reviewing court agrees with the trial court, but rather whether the trial court acted arbitrarily without the employment of

6

conscientious judgment or exceeded the bounds of reason, in view of all the circumstances. *Schuff*, ¶ 27.

¶16 We review for an abuse of discretion whether the district court correctly instructed the jury. *Peterson v. St. Paul Fire & Marine Ins. Co.*, 2010 MT 187, ¶ 22, 357 Mont. 293, 239 P.3d 904. "[W]hile a district court has broad discretion to formulate jury instructions, that discretion is limited by the overriding principle that jury instructions must fully and fairly instruct the jury regarding the applicable law." *Peterson*, ¶ 22 (quoting *Tarlton v. Kaufman*, 2008 MT 462, ¶ 19, 348 Mont. 178, 199 P.3d 263) (internal quotation marks omitted). In reviewing whether a particular instruction was properly given, "we consider the instruction in its entirety, as well as in connection with the other instructions given and with the evidence introduced at trial." *Tarlton*, ¶ 19 (quoting *Murphy Homes, Inc. v. Muller*, 2007 MT 140, ¶ 74, 337 Mont. 411, 162 P.3d 106).

## DISCUSSION

¶17 *Issue 1: Whether the District Court abused its discretion in declining to grant Spotted Horse's request for a default judgment based on the spoliation of video footage taken at BNSF's Diesel Shop on the day Spotted Horse was injured.*

¶18 Spotted Horse argues that the District Court abused its discretion in refusing to enter default judgment against BNSF for spoliation of the Diesel Shop's video footage taken on the day of Spotted Horse's alleged injury. Spotted Horse contends that BNSF's intentional destruction of video footage resulted in irreparable prejudice and forestalled any means to a fair resolution of his claim. Under the circumstances, Spotted Horse insists the only adequate sanction was an entry of default judgment against BNSF. BNSF counters that its actions were not intentional or committed in bad faith and further

7

maintains that Spotted Horse did not suffer prejudice because the video footage did not capture any of the alleged events.

¶19 In its denial of Spotted Horse's motion for default judgment, the District Court concluded that Spotted Horse had failed to present sufficient evidence to warrant "the most drastic of all sanctions, default judgment." As a remedial measure, the court prohibited BNSF from introducing or referring to any testimony or evidence that McLeod, Price, and Wood had watched the video footage and determined that the alleged incident was not viewable, reasoning that "BNSF should not be allowed to benefit by its failure to preserve the video footage." However, the court concluded that if Spotted Horse "tactical[ly]" chose to present information about the videos to the jury, he would forego the court's protection. In addition, the district court utilized a portion of Instruction No. 2 as an adverse instruction. Against this backdrop, we turn to the question of whether the District Court abused its discretion in failing to impose a default judgment.

¶20 District courts "are well equipped under the Montana Rules of Civil Procedure to address the problem [of spoliation of evidence] as it occurs and deal with it accordingly, even entering default when the circumstances justify such relief." *Oliver v. Stimson Lumber Co.*, 1999 MT 328, ¶ 32, 297 Mont. 336, 993 P.2d 11. Under certain circumstances, this Court has upheld or imposed default judgment as an appropriate sanction for discovery abuses. *See e.g.*, *Richardson*, ¶¶ 65, 68 (default judgment appropriate where the State's "pattern of willful and bad faith conduct" amounted to a "blatant and systemic" abuse of the discovery process that "undermined the integrity of

the entire proceeding"); *Culbertson-Froid-Bainville Health Care Corp. v. JP Stevens & Co. Inc* ., 2005 MT 254, ¶ 17, 329 Mont. 38, 122 P.3d 431 (default judgment warranted where discovery responses were "evasive [and] woefully incomplete" resulting in a "flagrant, complete and persistent disregard" of court orders and rules of civil procedure); *Schuff*, ¶ 81 (affirming imposition of a default judgment for discovery abuses after defendant acted "willfully and in bad faith shield[ing] Schuff from a clear view of the truth"); *cf. Stokes v. Ford Motor Co.*, 2013 MT 29, ¶ 20, 368 Mont. 365, 300 P.3d 648 (given that there was no wanton disregard of court orders or an intention to "slow down discovery," district court did not abuse its discretion in declining to enter default judgment).

¶21    We have emphasized that discovery abuses "must no longer be dealt with leniently and that the transgressors of discovery abuses should be punished rather than encouraged repeatedly to cooperate." *Schuff*, ¶ 70; *see also Richardson*, ¶ 56.  We have further stated that concerns "related to crowded dockets and the responsibility to maintain fair and efficient judicial administration have shifted the traditional reluctance to impose discovery-related sanctions to a judicial intolerance of discovery abuses." *Schuff*, ¶ 70 (quoting *McKenzie v. Scheeler*, 285 Mont. 500, 506, 949 P.2d 1168, 1171 (1997)).

¶22    Although the issue before us relates to the spoliation of video footage *before* the initiation of the formal discovery process, the rationale for imposing sanctions on a party for discovery abuse applies here with equal force.  As a sophisticated and recurrent party to litigation, BNSF is aware of its obligation to preserve evidence.  In fact, it has in the past been subject to complaints from litigants concerning spoliation of evidence, and–as

9

Spotted Horse asserted in the District Court–has previously been admonished in court for concealing or disposing of evidence.

¶23   For example, in the Thirteenth Judicial District of Montana, the district court granted the plaintiff's motion for relief relating to liability and struck BNSF's defense of contributory negligence after BNSF improperly disposed of a handset and cord, which were "key evidence of liability." Order Granting Relief, *Silliker v. BNSF*, DV 04-0955, 3-4 (Thirteenth Jud. Dist. Jan. 27, 2010). In granting relief, the court did not find bad faith, but stated that "BNSF knew of their [sic] duty to secure and retain possession of evidence" and "without that evidence both Silliker and BNSF would be deprived of the ability to reconstruct its condition prior to the incident, thereby making proof of either party's respective positions impossible." Order Granting Relief, *Silliker v. BNSF*, DV 04-0955, 4.

¶24   In *Dolan v. BNSF*, the Eighth Judicial District Court ordered BNSF to pay the plaintiff's attorney fees and associated costs of discovery after finding that BNSF had failed to be diligent in acquiring information about company vehicles which "existed and was readily available to [BNSF] at the time the Plaintiff propounded discovery request[s]" relating to his underlying claims. Order, *Dolan v. BNSF*, ADV 01-1090(B), 4-5 (Eighth Jud. Dist. Aug. 22, 2003).

¶25   In *Schmidt v. BNSF*, the same court addressed various discovery-related issues and abuses. It concluded that BNSF's "non-disclosure [of email communications, injury reports, and claims records] is neither isolated nor relatively insignificant" and "yet another instance in a larger recurring pattern and practice of dilatory and obstructive

10

discovery practices in this and other FELA cases before this Court." Order Den. BNSF Mot. for Prot. Orders and Aff. Previously-Imposed Disc. Sanctions on Addt'l Grounds, *Schmidt v. BNSF*, CDV-04-152(d), 11 (Eighth Jud. Dist. Ct. Mar. 1, 2006).

¶26 The district court made similar observations and conclusions when it addressed alleged discovery abuses in a related case, *Danielson v. BNSF*. "[A]llowing BNSF to simply claim 'no harm–no foul' and to remedy its non-disclosure with belated production and supplemental discovery by Plaintiff would allow BNSF to unjustly benefit" from its conduct "without any deterrent to the continuance of this practice." Order on Misc. Mot. and Order Imposing Sanctions in re Proof of Negligence and BNSF Vocational Rehab Program, *Danielson v. BNSF*, CDV-04-124(d), 16-17 (Eighth Jud. Dist. Ct. Mar. 13, 2006).

¶27 BNSF is a seasoned and sophisticated corporate litigant well aware of its obligations when responding to workplace violations and employee injuries and accidents. These obligations include the retention of evidence relevant to injury claims. In this case, BNSF supervisors took immediate action within minutes of Spotted Horse's alleged accident. While Price drove Spotted Horse to the hospital for medical treatment, BNSF supervisors began gathering and analyzing information related to the incident. Within hours of the alleged accident, according to testimony, three individuals viewed a brief portion of the video footage from one camera in the shop stall where Spotted Horse and Syverson were apparently working. And yet–inexplicably–this and other video footage from the shop was not retained.

¶28 BNSF takes the disconcerting position that the video footage would not have been useful even if preserved. In making this argument, BNSF relies on the recollection of three individuals–two of its own employees and one employee of an affiliate–who purportedly "agreed [the video] showed nothing of significance" and was otherwise "not relevant."

¶29 Our rules define relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M. R. Evid. 401. We reiterate the importance of relevant evidence within the context of cases involving the spoliation of evidence:

> Relevant evidence is critical to the search for the truth. The intentional or negligent destruction or spoliation of evidence cannot be condoned and threatens the very integrity of our judicial system. There can be no truth, fairness, or justice in a civil action where relevant evidence has been destroyed before trial. Historically, our judicial system has fostered methods and safeguards to insure that relevant evidence is preserved. Ultimately, the responsibility rests with both the trial and appellate courts to insure that the parties to the litigation have a fair opportunity to present their claims or defenses.

*Oliver*, ¶ 31.

¶30 We reject the notion that BNSF is entitled to unilaterally determine which evidence is relevant or valuable when investigating an alleged work-related accident preceding litigation. Such a decision must be left to the trial court. *See State v. Gai*, 2012 MT 235, ¶ 15, 366 Mont. 408, 288 P.3d 164 ("the trial judge is tasked with determining admissibility of evidence") (citing M. R. Evid. 104); *Preston v. Mont. Eighteenth Judicial Dist. Court*, 282 Mont. 200, 208, 936 P.2d 814, 819 (1997)

12

("discovery requests are to be construed broadly in favor of disclosing any information tending to lead to admissible evidence. Whether that evidence is admissible is for the court to decide at trial, not for [the party] to determine at the discovery stage of proceedings"); *see also Patton v. Wal-Mart Stores, Inc.*, 2013 U.S. Dist. LEXIS 165617, *14 (D. Nev. Nov. 20, 2013) ("[w]hether 'nothing' or 'something' was caught on film is an evidentiary question of relevance" for the court). Interestingly, BNSF chose to collect and secure Spotted Horse's hard hat even though McLeod determined the hard hat (like the video footage) had "no evidence of a significant impact" and "nothing that show[ed] [him] there was anything that happened to it."

¶31 The fact that the video footage was destroyed prior to the submission of Spotted Horse's claim affords BNSF no relief. As its internal policies contemplate, BNSF clearly had the means to collect the video footage by simply sending an email or making a telephone call as it has routinely done for other investigations involving rule violations and work-place injuries. Whether the spoliation of video footage was a litigation tactic or inadvertent as BNSF claims, BNSF's conduct has effectively undermined the "search for the truth" of what actually transpired on September 13, 2009. *See Oliver*, ¶ 31; *see also Schuff*, ¶ 79 ("'excusable ignorance' defense cannot be looked upon with anything less than disfavor").

¶32 Even if we were to accept BNSF's contention that the *one* video camera did not capture Spotted Horse's alleged injury, the recordings from this video camera and others positioned throughout the Diesel Shop could have revealed a wealth of information relating to the alleged injury–a fact BNSF admitted during pre-trial depositions. For

13

example, the video cameras could have captured the exact timeframe and the activity that occurred before or after the alleged injury; whether Spotted Horse and Syverson were carrying particular tools or equipment, including the rope that allegedly slipped through Syverson's hands; whether Spotted Horse's mannerisms or gait appeared altered when he walked to the computer terminal to report his injury after it occurred; whether, according to the disputed testimony of BNSF employee Josh Allen, "Spotted Horse drop[ped] down into a sitting position on the locomotive step" after the alleged incident; or, as BNSF employee Larry Lund stated, whether Spotted Horse's claims were "bogus." Because this video footage was destroyed, Spotted Horse was left with the impossible task at trial of accurately recreating that which was irretrievably lost.

¶33 An even more insidious result of the destruction of the evidence was the District Court's pre-trial ruling that precluded BNSF from offering evidence that the cameras showed no accident, unless Spotted Horse opened the door by informing the jury that the videos had been destroyed. Under the court's ruling, once Spotted Horse informed the jury about the destruction of the video evidence, BNSF was then free to tell the jury that it had observed the video footage and that it did not show that an accident had occurred. In other words, BNSF was allowed to enjoy the benefit of its destruction of the evidence by implying to the jury that Spotted Horse's injury never happened. Thus, BNSF's conduct effectively derailed Spotted Horse's right to have "a fair opportunity to present [his] claims or defenses." *Oliver*, ¶ 31.

¶34 In seeking reversal and a default judgment, Spotted Horse relies in part on *Peschel v. City of Missoula*, 664 F. Supp. 2d 1137 (D. Mont. 2009), a case concerning the

14

spoliation of a police vehicle video recording of an arrest allegedly performed with "unreasonable force," which later became the subject matter of a civil suit. The Federal district court had previously determined that the City of Missoula had a duty under Montana law to preserve video recordings throughout the course of the investigation and the disposition of the criminal charge and after acquittal, because the prospect of a civil suit was "reasonably foreseeable." *Peschel*, 664 F. Supp. 2d at 1141.

¶35 Countering the plaintiff's request for default judgment, the City of Missoula argued that the loss of video evidence did not prejudice the plaintiff because witnesses were available to testify as to what they observed. *Peschel*, 664 F. Supp. 2d at 1145. As an alternative, the City proposed prohibiting "the officers from testifying as to what they saw in the video." *Peschel*, 664 F. Supp. 2d at 1145 (internal quotation marks omitted). The court found that this "purported sanction would have absolutely no punitive, deterrent, or remedial value" and would otherwise condone "the spoliation of the best evidence available to resolve the factual dispute with the greatest accuracy." *Peschel*, 664 F. Supp. 2d at 1145.

¶36 The court in *Peschel* further concluded that the rebuttable presumption created by an adverse instruction allowing the jury to infer that the video recording would have been unfavorable to the City "would not sufficiently punish the City for its spoliation nor serve as a sufficient disincentive to destroy evidence," otherwise "pitting the evidence of its officers against the Peschels and the other percipient witnesses–unphased by its spoliation of the video recording." *Peschel*, 664 F. Supp. 2d at 1148. Ultimately, the court did not allow evidence regarding the spoliation because doing so "would not

15

enhance, but actually degrade, the truth-finding process." *Peschel*, 664 F. Supp. 2d at 1148. The court found that the most appropriate sanction was a conclusive finding that the arresting officers had used unreasonable force. *Peschel*, 664 F. Supp. 2d at 1145.

¶37 Here, the District Court reasoned that "BNSF should not be allowed to benefit by its failure to preserve the video footage." We agree. However, the court then undermined its assertion by imposing a sanction that placed Spotted Horse in a "lose-lose" position. If Spotted Horse agreed not to tell the jury that BNSF had destroyed the video footage, then BNSF would be precluded from telling the jury what its employees saw on the videos. However, if Spotted Horse told the jury that the videos had been destroyed, then BNSF employees would be free to tell the jury that the claimed injury simply did not show up on any cameras. The ultimate effect of the sanction, as observed in *Peschel*, did not punish BNSF as the transgressor; rather, it invited BNSF to capitalize on the destruction of the video footage with its inference that Spotted Horse fabricated his injury–a focus that "actually degrade[d] the truth-finding process." *See Peschel*, 664 F. Supp. 2d at 1148.

¶38 Although the district court instructed the jury to view BNSF's evidence "with distrust" if it appeared that BNSF "intentionally or recklessly destroyed or concealed evidence favorable to the other party," as in *Peschel*, this instruction was an inadequate cure for the prejudice to Spotted Horse.

¶39 Although BNSF clearly knows better than to dispose of video footage of an accident scene, it is simply not possible to determine whether the destruction of the evidence was intentional or inadvertent. Given this circumstance, we do not find that the

16

District Court's refusal to grant Spotted Horse's request for a default judgment was an abuse of discretion. However, we do conclude that the District Court abused its discretion when it declined to impose a meaningful sanction on the railroad, and instead fashioned a ruling that ultimately rewarded rather than punished BNSF for its destruction of evidence. Accordingly, we reverse the judgment of the District Court and remand this matter for a new trial, at which time the court shall fashion a sanction that is commensurate with the significance of BNSF's actions in allowing the video footage to be destroyed, and which will satisfy the remedial and deterrent goals of sanctions for the spoliation of evidence.

¶40 *Issue 2: Whether the District Court abused its discretion when it instructed the jury as to BNSF's duty of care in a FELA action.*

¶41 Spotted Horse also contends that the court committed error by giving an improper jury instruction concerning BNSF's duty of care under FELA. Jury Instruction No. 11 provided:

> BNSF was not obligated to eliminate all risks in the work place; it was only obligated to eliminate unreasonable risks.

¶42 We agree that the language in Instruction No. 11 incorrectly states BNSF's duty of care and seemingly contradicts the language found in Jury Instruction No. 10, to which neither party objected and which provided in pertinent part:

> Thus, the railroad is negligent if it fails to use reasonable care to provide railroad workers with a reasonably safe place to work. Reasonable care is the care that a reasonably prudent person would use in the conduct of his, her, or its own affairs in order to avoid injury or damage to his, her, or its own person or property as well as the person or property of others. **The amount of care or caution required of a reasonably prudent person**

17

**varies according to the dangers known or reasonably foreseeable to the person**. Negligence may consist of action or inaction.

(Emphasis added.)

¶43  We conclude that on remand, Instruction No. 11 shall not be given.

## CONCLUSION

¶44  We reverse and remand for further proceedings consistent with this opinion.


                                        /S/ PATRICIA COTTER

We Concur:


/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ JIM RICE



Justice Michael E Wheat, specially concurring.

¶45  I agree with the Court's decision to reverse the judgment of the District Court and to order more serious spoliation sanctions against BNSF on remand. I would, however, remand to the District Court with an instruction to enter default judgment, because the audacity of the spoliation in this case warrants more than a mere negative inference in favor of Spotted Horse.

¶46  This is not a case where the plaintiff slept on his claim. Spotted Horse provided prompt notice of his intention to bring suit and a prompt request for the surveillance video that would have resolved several factual disputes and all but proven a number of

18

the elements of his claim. This is also not a case where the information was lost mistakenly or inadvertently. The destruction of the video was the result of knowing, culpable conduct. BNSF was on notice of Spotted Horse's intention to sue. It knew the value of the video, and it knew that the video was exclusively in its control. Taking advantage of this control, BNSF not only let the video be destroyed but also destroyed the best evidence of what the video would have shown by moving its surveillance cameras. Meanwhile, BNSF took special care to preserve other particular items of evidence that it thought were "perishable," "one of a kind," or "critical."

¶47 Such knowing, calculated, and prejudicial spoliation of evidence demands default judgment. It is the obligation of every Montana court to protect the integrity of the judicial system and to ensure proper administration of justice. *See Oliver v. Stimson Lumber Co.*, 1999 MT 328, ¶ 31, 297 Mont. 336, 993 P.2d 11. Usually this means that there is a presumption in favor of resolution of controversies on their merits. But, in cases where a party maliciously misuses our judicial system, this presumption is forfeited and the obligation to protect the judicial system instead requires courts to remedy the misuse, to punish the misuser, and to deter future misuse. *See Richardson v. State*, 2006 MT 43, ¶ 68, 331 Mont. 231, 130 P.3d 634; *Schuff v. A.T. Klemens & Sons*, 2000 MT 357, ¶ 81, 303 Mont. 274, 16 P.3d 1002; *Oliver*, ¶ 34. Spoliation is an especially pernicious form of misuse, and this Court and other Montana courts should not shy from responding with commensurate sanctions.

19

¶48 Spoliation has a profound effect on our judicial system. "Aside perhaps from perjury, no act serves to threaten the integrity of the judicial process more than the spoliation of evidence. Our adversarial process is designed to tolerate human failings – erring judges can be reversed, uncooperative counsel can be shepherded, and recalcitrant witnesses compelled to testify. But, when critical documents go missing, judges and litigants alike descend into a world of *ad hoc*[] . . . half measures – and our civil justice system suffers." Margaret M. Koesel et al., *Spoliation of Evidence: Sanctions and Remedies for Destruction of Evidence in Civil Litigation* 1 (3d ed., 2013); *see also* Charles R. Nesson, *Incentives to Spoliate Evidence in Civil Litigation: The Need for Vigorous Judicial Action*, 13 Cardozo L. Rev. 793, 793 (1991) ("By its nature spoliation is invisible. The evidence may have been unknown to anyone but the spoliator. The act itself need leave no trace. . . . Spoliation is an effective, and, I believe, a growing litigation practice which threatens to undermine the integrity of civil trial process."). "There can be no truth, fairness, or justice in a civil action where relevant evidence has been destroyed before trial." *Oliver*, ¶ 31.

¶49 Unfortunately, spoliation and other obstructive techniques have become much too commonplace. *See, e.g.*, *Bilesky v. Shopko Stores Operating Co., LLC*, 2014 MT 300, ¶¶ 6-8, 377 Mont. 58, 338 P.3d 76; Order Granting Relief, *Silliker v. BNSF*, Jan. 27, 2010, DV 04-0955 (Mont. 13th Dist. Ct.); Order, *Dolan v. BNSF*, Aug. 22, 2003, ADV-01-1090(B) (Mont. 8th Dist. Ct.); *Danielson v. BNSF*, March 13, 2006, CDV-04-124(d) (Mont. 8th Dist. Ct.); *Schmidt v. BNSF*, March 1, 2006, CDV-04-252(d)

(Mont. 8th Dist. Ct.); Koesel et al., *supra*, at xvi-xvii. Commentators have advocated vigorous judicial action in response, *e.g.* Nesson, *supra*, at 805-07, and this Court has recognized the need to address the problem. *Oliver*, ¶¶ 31-34, 40.

¶50 The Court even went so far as to recognize a new tort for third party spoliation, noting that it is this Court's responsibility to ensure that our judicial system provides a fair opportunity for litigants to present their claims and defenses. *Oliver*, ¶¶ 31, 34, 40. The Court did not make that tort available against parties to the litigation, because it reasoned that the strength and breadth of the remedies available to Montana courts, which include default judgment, was already sufficient. *Oliver*, ¶ 32. While this is true – Montana courts do have a sufficient set of available remedies to adequately address spoliation – the remedies are meaningless unless they are actually used and effectively crafted.

¶51 As such, Montana courts should not shrink from granting default judgment where, as here, spoliation is willful, in bad faith, or knowingly committed in order to obscure the truth and to prevent accurate decision making. By failing to take such action when it is warranted, we fail the spoliation victim and our system of justice, while at the same time rewarding the spoliator with the result he or she sought: an advantage in litigation. By failing to take such action, we set the stage with perverse incentives and encourage further spoliation. Until we are willing to respond with sanctions commensurate to the damage caused by intentional spoliation – that is, with default judgment – the reward from destroying evidence will continue to outweigh the risk.

21

¶52 The District Court's decision did not effectively serve to remedy BNSF's spoliation, to punish BNSF, or to dissuade others from committing similar acts. BNSF still comes out ahead, served by its misconduct. Again, this case is one where the spoliator, BNSF, acted knowingly and purposely to destroy evidence. In response to such actions, I would instruct the District Court to order default judgment in favor of Spotted Horse on remand.

/S/ MICHAEL E WHEAT

Justice Laurie McKinnon, dissenting.

¶53 I agree with the Court's pronouncement that BNSF, or indeed any litigant, is not "entitled to unilaterally determine which evidence is relevant or valuable . . . ." Opinion, ¶ 30. Nevertheless, I am troubled by our decision today, in which we sanction BNSF based not on its conduct in the case before us, but on its alleged prior bad acts in completely unrelated past litigation. Opinion, ¶¶ 22-26.

¶54 I believe our inquiry should be limited to the circumstances before us and not focused on punishing a litigant we perceive to be a bad actor. The Court primarily premises its conclusion that BNSF's conduct was sanctionable on the fact that BNSF has previously been sanctioned for discovery abuses, rather than on an analysis of the record in this case. While I do not mean to say that we—or trial courts and opposing parties, for that matter—should put up a façade of naiveté in the face of systemic abuses, I do think

22

we should honor the basic concept that a party appearing before this Court should not be pre-judged on the basis of an allegedly bad character. *See* M. R. Evid. 404. Nor should a party be exempted from receiving the benefit of this principle because that party is a corporate entity rather than an individual.

¶55 A review of the record in the case before us is sufficient to demonstrate that BNSF's conduct was inappropriate. Disturbingly, Ahern stated in her deposition that BNSF has *no* policy requiring supervisors to promptly notify the claims department of incidents; that she has received *no* formal training regarding the collection and preservation of evidence; and that she was not aware of *any* BNSF policy regarding the preservation of evidence relevant to an injury claim. Price characterized his shop's practice regarding video footage as follows: "[I]f we think it's useful or of value or has any bearing on the incident we are investigating, we would make the request of the resource protection desk to save a particular part of that video."

¶56 Consistent with this practice, after reviewing about 15 minutes of footage from one camera, Price and McLeod made the independent determination, absent consultation with any claims specialist or legal counsel, that the footage contained "no evidence to preserve." At the very least, preservation of the footage would have conclusively determined whether the accident was recorded. Further, McLeod acknowledged that there were many other cameras in the shop that may have shown Spotted Horse before or after the accident, or personnel in the area surrounding the stall where the accident took place. The footage from these other cameras was never reviewed at all. BNSF's lack of any policy or training whatsoever addressing the preservation of evidentiary materials

23

directly resulted in the destruction of potentially relevant evidence prior to trial. As the Court notes, "The intentional or negligent destruction or spoliation of evidence cannot be condoned and threatens the very integrity of our judicial system." Opinion, ¶ 29 (quoting *Oliver v. Stimson Lumber Co.*, 1999 MT 328, ¶ 31, 297 Mont. 336, 993 P.2d 11). I have no trouble concluding that BNSF's failure to adopt a reasonable policy—or *any* policy—for the preservation of evidence regarding workplace injuries constituted, in this case, negligent spoliation of evidence, if not more. The depositions filed in this case are sufficient to lead to this conclusion.

¶57 Although I would conclude that BNSF's conduct merited the imposition of sanctions, I am mindful that we review the District Court's decision regarding the appropriate form of sanctions for an abuse of discretion. *Richardson v. State*, 2006 MT 43, ¶ 21, 331 Mont. 231, 130 P.3d 634. I believe the District Court attempted in good faith to neutralize the effect of BNSF's destruction of evidence, while recognizing that a trial on the merits is generally favored over a default judgment. *Brilz v. Metro. Gen. Ins. Co.*, 2012 MT 184, ¶ 15, 366 Mont. 78, 285 P.3d 494 (citing *Schmitz v. Vasquez*, 1998 MT 314, ¶ 27, 292 Mont. 164, 970 P.2d 1039). The Court assumes that if BNSF employees were permitted to testify that the video footage did not show the accident, this would establish an inference in the minds of the jury that the accident did not occur. Opinion, ¶ 33. While this would be one possible interpretation of that testimony, it is not necessarily the only interpretation, or even the most logical. The depositions are clear that the camera angle was insufficient to show the area where the accident reportedly occurred. This fact does not imply that the accident did not occur. Cross-examination of

24

witnesses for BNSF should allow Spotted Horse to draw out details of their failure to preserve, or even fully review, the evidence available. The testimony could just as likely result in the negative inference that BNSF engaged in a cover-up.

¶58 While stronger sanctions were certainly available and may have been appropriate, the decision regarding the suitable form of sanctions was left to the discretion of the District Court. We fail to recognize the distinction between a trial court's discretion in assessing the propriety of sanctions and an appellate court's role in reviewing the exercise of that discretion when we cite the opinions of federal district courts on the issue. Opinion, ¶¶ 34-37 (citing *Peschel v. City of Missoula*, 664 F. Supp. 2d 1137 (D. Mont. 2009)). Although this Court, if vested with the discretion to make an initial determination of the form of sanctions, may have exercised that discretion differently than the District Court in this instance, I am not convinced that the District Court abused its discretion by failing to impose stronger sanctions.

¶59 Finally, I believe the Court's analysis of Jury Instruction No. 11 is insufficient. It is not readily apparent on the face of the instructions that an obligation "to eliminate unreasonable risks" is inconsistent with or contradicts the duty of a reasonable person to use reasonable care regarding reasonably foreseeable risks, stated in Jury Instruction No. 10. The instructions, taken as a whole, adequately instructed the jury regarding an employer's duty to exercise reasonable care when it knows or should know of a potential hazard in the workplace. *See Gallose v. Long Island R.R. Co.*, 878 F.2d 80, 85 (2d Cir. 1989); *Tobin v. Natl. R.R. Passenger Corp.*, 677 F. Supp. 674, 675 (D. Mass. 1988).

¶60	For the foregoing reasons, I dissent and would affirm the judgment of the District

Court.

/S/ LAURIE McKINNON