Justice Dirk Sandefur delivered the Opinion and Order of the Court.
***458 ¶ 1 This matter comes before the Court on the petition of Defendant ***459 Montana State University-Bozeman (MSU) seeking exercise of supervisory control over pending proceedings in the underlying matter of Cepeda v. Montana State University , Cause No. DDV-2012-906, Montana First Judicial District Court, Lewis and Clark County, the Honorable James P. Reynolds, presiding. By order filed April 11, 2018, the District Court summarily adjudicated liability against MSU on Plaintiff Breanne Cepeda's asserted negligence claim[1] as an evidence spoliation sanction pursuant to M. R. Civ. P. 37(e). MSU asserts that the District Court is proceeding under a mistake of law and petitions for supervisory control and reversal of the sanctions order. Upon consideration of MSU's petition, Cepeda's response, and the pertinent facts of record, we find that exercise of supervisory control is necessary and proper and accordingly reverse and remand for further proceedings.[2] *545 ISSUES PRESENTED
1. Whether exercise of supervisory control is necessary and proper in this case?
2. Whether the District Court abused its discretion in imposing default judgment as an evidence spoliation sanction pursuant to M. R. Civ. P. 37(b)-(c) and (e) ?
FACTUAL AND PROCEDURAL BACKGROUND
¶ 2 In 2006, MSU hired Shuichi Komiyama as a teaching professor in the Music Department of the MSU College of Arts and Architecture (A&A). At pertinent times, Komiyama was also the Director of the MSU Orchestra and Jazz Band. Incident to those duties, Komiyama developed and administered an informal group of hand-picked students known as his Assistant Conductors group. Komiyama often worked ***460 separately with students of the group and chaperoned them on out-of-town and overnight road trips with little or no administrative oversight. Evidence exists that Komiyama also incidentally fraternized with them socially in public and private settings, including his home.
¶ 3 In 2008, Cepeda was an MSU music student when she became a member of Komiyama's Assistant Conductors group. Like other members of the group, Cepeda subsequently developed a relatively close and informal relationship with Komiyama in the various educational and incidental social settings that were typical of the group.
¶ 4 Evidence exists that, in 2009, a male member of the group (Student M) fell out of favor with Komiyama. In or about November 2009, in response to perceived negative treatment from Komiyama, Student M ultimately complained to the Head of the Music Department (Alan Leech) who recommended that he submit a written complaint to Assistant A&A Dean Heather Bentz. Evidence exists that, in December 2009, upon receipt of an email complaint, Bentz interviewed Student M and then consulted about the matter with Glenn Puffer,[3] who subsequently directed Leech to have "a serious talk" with Komiyama and to continue to monitor his conduct. After further communication with Bentz, Leech spoke with Komiyama and followed up with a corrective counseling letter on March 2, 2010. Leech's corrective counseling letter and various preserved email communications referencing Student M, Bentz, and Leech reflect MSU's handling of the Student M complaint. Bentz left MSU's employ two months later in May 2010.
¶ 5 Soon after resolution of the Student M complaint, Leech became aware of additional unprofessional conduct by Komiyama toward music students and faculty. A timeline subsequently prepared by Leech[4] and attached to his deposition in the underlying matter recounts Leech's view that Komiyama "was still causing much friction in his dealings with [f]aculty and [s]tudents." Leech noted that, after gaining tenure in September 2010, Komiyama had "started to be more blatant with his transgressions with students (particularly in the MSU Orchestra)" and ***461 disrespectful toward other faculty members. Leech's timeline further recounted that, in or about October 2010, he received an email from the conductor of the Bozeman Symphony forwarding him a link to an Internet article regarding:
a California case in which a person named Komiyama was accused of some sort of sexual transgression with a high school student. There was no statement as to whether there was a conviction contained in the notice and [Leech] could find nothing further online at the time.
Leech recounted that "[i]t seemed likely that this was our [Komiyama], but since it was just an Internet reference, and from about 20 some years in the past, I could not really act on it in clear conscience."[5]
*546 ¶ 6 Leech's timeline reflects that he "started to compile a file" on Komiyama in December 2010 "to take to the MSU legal office" regarding "various complaints and information" regarding Komiyama's "questionable activities." Leech noted that, in or about January 2011, Music Department Professor Sara Biber told him:
about a couple of female students who had talked with her about uncomfortable situations with [Komiyama]. The students wanted to remain anonymous and would not come directly to [Leech] with the accusations, so [Leech] suggested that [Biber] take them to the MSU attorney's office where they could talk directly with [MSU's] female attorneys ... [Biber later advised] that unfortunately, they refused to go.
Leech's timeline further reflects that he had also heard unconfirmed rumors of Komiyama offering alcoholic beverages to students at his home. Leech recalled that, on February 18, 2011, Student M's father called Leech and advised that he had personally observed Komiyama offer alcoholic beverages to students in his home when the father was there in the company of his son during a visit. Leech further recalled that, in late February 2011, he also:
heard from a high school teacher in Bozeman that [Komiyama] had been accused of 'sexting' high school girls while engaged in public school coaching in Billings [earlier that month]. The Billings high school administration would not allow him to come into their schools again. [Leech] called the Billings Music ***462 Supervisor, Rob Wells[,] to discuss this and asked him if he would please send [Leech] a letter outlining the accusation. ... [Leech] subsequently also made a phone call to the Orchestra Director at the Billings school where the incident took place.
On February 23, 2011, Leech met with MSU's in-house legal counsel (Leslie Taylor and Pam Merrell)[6] to discuss his knowledge and concerns about Komiyama's unprofessional conduct toward students and faculty. Leech noted that counsel advised him to report back after further documenting his concerns.
¶ 7 Leech's timeline reflects that, on March 8 or 9, 2011, he again spoke with Komiyama about his continuing concerns regarding Komiyama's unprofessional conduct. Leech recalled that Komiyama rebuffed him, which Leech subsequently reported "to the Dean." Leech's timeline notes that, in mid-March 2011, he first heard "rumors" of Komiyama "partying in a semi-undressed condition in his room with students" at an educational convention in Missoula on October 10, 2010, but that "no student had, or would, come forward with personal testimony about the actual events." However, in late March 2011, "[s]everal students finally came forward ... willing to testify about the problems they were having" with Komiyama. Leech interviewed those students and kept notes of the interviews.
¶ 8 According to Leech's timeline, Cepeda contacted him on April 1, 2011, while on a break from student teaching in Denver. Leech recounted that Cepeda "verbally described [Komiyama's] offensive actions and [an] eventual rape" and "promised to send a signed letter." Leech advised her to call the police, and promised that he would "act with MSU legal office backing as soon as [Leech] had her letter in hand." The timeline notes that on April 6, 2011, Leech separately received a letter from the Billings School District Human Resource Officer confirming that the District had banned Komiyama from Billings schools following its investigation of the February 2011 sexting incident. On April 8, 2011, Leech received a follow-up email from Cepeda documenting her complaints about Komiyama, specifically including the allegation that he subjected her to non-consensual sexual intercourse at his home in or about November 2010. Both Leech's timeline and the affidavit of MSU counsel Leslie Taylor reflect that Leech immediately delivered the entirety of his compiled ***463 documentation regarding Komiyama to MSU counsel. The *547 documentation included Cepeda's email, other email communications, signed statements from MSU music students, correspondence from the Billings School District, and Leech's notes regarding various student interviews and related matters.
¶ 9 Leech's timeline further reflects that, on April 14, 2011, the Music Supervisor of the Bozeman Public Schools emailed him a link to an Internet story "about a [Shuichi] Komiyama in California who had been charged with sexual" misconduct. The timeline notes that Leech immediately forwarded the email to counsel Taylor and that the link was to the same Internet story that he first saw in late February 2011.[7] On May 15, 2011, Leech retired from MSU as previously planned.
¶ 10 After receiving the Leech materials on April 8, 2011, Taylor excluded Komiyama from campus the next business day pending further investigation. At Taylor's direction, MSU's information technology (IT) personnel immediately preserved Komiyama's MSU email account, deleted his access to the MSU system, and later removed and preserved the hard drive from Komiyama's office computer for imaging. On April 14, 2011, the President of MSU directed MSU Title IX Officer Diane Letendre to investigate the various allegations and issues raised by the Leech materials. Letendre and associate MSU legal counsel Merrell subsequently conducted a comprehensive internal investigation culminating in a thirty-page Investigation Report, dated July 22, 2011. The report recounts that the investigators interviewed Cepeda, Komiyama, seven MSU staff and faculty members, three public witnesses, a parent of an MSU student, and a number of students who had been Komiyama music students (including Assistant Conductors), who had complained about Komiyama, who had requested interviews, or who MSU investigators identified as possible witnesses. The report noted that investigators also obtained copies of emails from Cepeda regarding communications between her and Komiyama and that the Billings School District had similarly "provided copies of interview notes and text messages"
***464 between Komiyama and the Billings High School student involved in the February sexting incident.
¶ 11 During the pendency of MSU's internal investigation, Cepeda served a written notice on the Tort Claims Division of the Montana Department of Administration stating her intent to file a legal claim for damages against MSU based on Komiyama's conduct toward her.[8] Under a cover letter dated May 26, 2011, the Tort Claims Division forwarded a copy of the notice to MSU.[9] On June 15, 2011, counsel Merrell emailed a records preservation notice to Susan Agre-Kippenham, the recently departed or outgoing A&A Dean; Joseph Fedock, the new A&A Dean; Gregory Young, the new head of the Music Department after Leech retired in May 2011; and Carole McLean, a music department administrator. The notice advised that "it is possible that some party will sue MSU in relation to the [Shuichi] Komiyama Investigation" and "I am required under the law to make sure that we do not inadvertently destroy information related to potential lawsuits." The notice accordingly instructed the recipients to:
save all correspondence (including voicemail, email, videos, etc.) you or others in the college or music department may have with Komiyama or his students, and that you take steps to assure it is not destroyed. You must treat any other documents related to Komiyama and his students similarly and make sure that you and all others with such documents retain the documents and that they are not destroyed.
*548 This includes electronic correspondence or documents of any type, including email, word processing, calendars, voice messages, videos, photographs, information in your cellphones, including texts, etc. ... If you have any such documents you may send them to [Merrell] for safekeeping, if you wish.[10]
¶ 12 On August 11, 2011, Cepeda filed a quid pro quo sexual harassment claim (i.e., gender discrimination claim) against MSU with the Human Rights Bureau of the Montana Department of Labor and ***465 Industry.[11] Cepeda settled the sexual harassment claim seven months later by accepting an offer of judgment from MSU. On October 9, 2013, almost two and a half years after the completion of MSU's internal investigation, Cepeda commenced the underlying District Court litigation by filing a claim alleging that MSU negligently hired or supervised Komiyama and that MSU's negligence caused Cepeda to suffer harm in the form of non-consensual sexual intercourse allegedly inflicted on Cepeda by Komiyama on November 8 or 9, 2010. In September 2015, the District Court heard oral argument on the parties' cross-motions for summary judgment, discovery sanctions, and preliminary evidentiary rulings. Two and a half years later, on April 11, 2018, the court granted Cepeda's sanctions motion and adjudicated liability against MSU as a spoliation sanction pursuant to M. R. Civ. P. 37(e).
DISCUSSION
¶ 13 1. Whether exercise of supervisory control is necessary and proper in this case?
¶ 14 We have "general supervisory control over all other" Montana courts. Mont. Const. art. VII, § 2 (2). We generally exercise this control only by discretionary writ under extraordinary circumstances including, where a lower court is proceeding under a mistake of law which, if left uncorrected prior to final judgment, will result in significant injustice for which ordinary appeal will not be an adequate remedy. M. R. App. P. 14(3) ; Park v. Mont. Sixth Judicial Dist. Court , 1998 MT 164, ¶ 13, 289 Mont. 367, 961 P.2d 1267. In this track, judicial economy and avoidance of "inevitable procedural entanglements" are "appropriate reasons" for exercise of supervisory control. Truman v. Mont. Eleventh Judicial Dist. Court , 2003 MT 91, ¶ 15, 315 Mont. 165, 68 P.3d 654.
¶ 15 Because they are in the best position to assess the nature and effect of discovery abuses, district courts have broad discretion to impose discovery sanctions under M. R. Civ. P. 37(b)-(f). Richardson v. State , 2006 MT 43, ¶ 21, 331 Mont. 231, 130 P.3d 634 ; Xu v. McLaughlin Research Inst. for Biomedical Sci., Inc. , 2005 MT 209, ¶ 17, 328 Mont. 232, 119 P.3d 100. However, this discretion is not unfettered. Orders imposing or denying discovery sanctions are subject ***466 to review for an abuse of discretion. Peterman v. Herbalife Int'l, Inc. , 2010 MT 142, ¶ 14, 356 Mont. 542, 234 P.3d 898 ; Xu , ¶ 17. An abuse of discretion occurs if a discretionary ruling is based on a mistake of law, clearly erroneous finding of fact, or arbitrary reasoning, lacking conscientious judgment or exceeding the bounds of reason, resulting in substantial injustice. City of Missoula v. Mountain Water Co. , 2018 MT 139, ¶ 9, 391 Mont. 422, 419 P.3d 685. Whether a district court abused its discretion is a question of law subject to de novo review. Farmers Union Cent. Exch., Inc. v. Mont. Dep't of Revenue , 272 Mont. 471, 474, 901 P.2d 561, 563 (1995) (clearly erroneous standard applies only to " 'pure' findings of fact"); Maguire v. State , 254 Mont. 178, 181-82, 835 P.2d 755, 757-58 (1992) (conclusions of law, questions of law, and legal components of ultimate facts or mixed questions of law and fact reviewed de novo for correctness). Whether a district court correctly interpreted or applied governing law to pertinent facts is a question of law. BNSF Ry. Co. v. Cringle , 2012 MT 143, ¶ 16, 365 Mont. 304, 281 P.3d 203 ; Hulstine v. Lennox Indus. , 2010 MT 180, ¶ 16, 357 Mont. 228, 237 P.3d 1277. *549 ¶ 16 This case presents a novel issue as to the proper construction of M. R. Civ. P. 37(e) (limitation on sanctions for good faith loss of electronically-stored information) within the framework of M. R. Civ. P. 37(c)(1)(C) and (b)(2)(A)(i) (default judgment as sanction for failure to produce discoverable information). Presumably due to the dearth of guiding Montana precedent, the District Court's sanctions order did not specifically analyze what standards apply under M. R. Civ. P. 37(e). With only cursory reference to M. R. Civ. P. 37(e), the court essentially imposed a severe sanction by analogy to Spotted Horse v. BNSF Ry. Co. , 2015 MT 148, 379 Mont. 314, 350 P.3d 52, and in contrast to Estate of Willson v. Addison , 2011 MT 179, 361 Mont. 269, 258 P.3d 410, neither of which reference M. R. Civ. P. 37(e). The sanction precluded a determination on the genuinely-disputed merits of the pivotal issue of whether MSU negligently hired or supervised Komiyama in disregard of a foreseeable risk that he would subject students to sexual assault, thus leaving for trial only proof of causation and damages. If the District Court abused its discretion, failure to exercise supervisory control will unnecessarily delay correction of the error at undue cost to both parties by appeal and remand for a new trial in toto . If the District Court did not abuse its discretion, exercise of supervisory control will promptly and efficiently affirm the ruling, thereby eliminating that cloud over the remaining litigation and settlement prospects and clearing the deck for efficient and ***467 unencumbered determination on the merits of the claim as necessary.
¶ 17 Because the remaining course of litigation dramatically pivots on a discovery sanction, the issue in this case is not akin to a typical assertion of error on a summary judgment ruling where the losing party had a full and fair opportunity to either preclude summary judgment or prevail by making a sufficient factual or legal showing on the available evidence. It similarly varies from a typical assertion of an evidentiary error that may or may not be significant in the hindsight of the trial evidence. Here, a trial truncated to adjudication of causation and damages will invariably involve presentation of the evidence pertinent to liability in order to prove the necessary chain of causation and damages. In addition to altering the scope of trial and the parties' presentation for trial, the court's ruling will also dramatically affect the parties' settlement negotiations by significantly tipping the scales to one side on discretionary procedural grounds rather than on the merits.[12]
¶ 18 We have previously found exercise of supervisory control necessary and proper where the ruling at issue dramatically affects the cost and scope of trial preparation and presentation and also significantly alters the dynamic of settlement negotiations. See Stokes v. Mont. Thirteenth Judicial Dist. Court (Stokes I ), 2011 MT 182, ¶¶ 6-8, 361 Mont. 279, 259 P.3d 754 ; Truman , ¶ 15 ; Plumb v. Mont. Fourth Judicial Dist. Court , 279 Mont. 363, 370, 927 P.2d 1011, 1015-16 (1996) (superseded on other grounds). Contrary to Cepeda's assertion, review of the District Court's sanctions order is not dependent on an undeveloped factual record or determination of genuine issues of material fact within the domain of the fact finder. Based on the nature of the issue and the sanction imposed, the pertinent factual record is currently as developed as it is going to be and will be unaffected by the ***468 remaining course of litigation in any event. As in Stokes I , Truman , and Plumb , judicial economy and the avoidance of unnecessary procedural complication warrant the exercise of supervisory control to avoid substantial injustice in the form of undue cost, delay, and a dramatically-altered *550 settlement dynamic. We hold that exercise of supervisory control is necessary and proper because this case presents a significant question as to whether the District Court is proceeding under a mistake of law which, if uncorrected prior to final judgment, will likely cause significant injustice rendering ordinary appeal inadequate.
¶ 19 2. Whether the District Court abused its discretion in imposing default judgment as an evidence spoliation sanction pursuant to M. R. Civ. P. 37(b)-(c) and (e) ?
¶ 20 Compliance with discovery rules and orders is essential to the efficient and fundamentally fair administration of justice on the merits. Peterman , ¶ 17 ; Richardson , ¶¶ 56-57 ; Owen v. F. A. Buttrey Co. , 192 Mont. 274, 276-81, 627 P.2d 1233, 1235-37 (1981). See also M. R. Civ. P. 1. Upon a party's failure "to provide information requested in accordance with" M. R. Civ. P. 26 - 36, a district court may impose any sanction "listed in Rule 37(b)(2)(A)(i)-(vi)" in addition to, or in lieu of, imposing reasonable costs, including attorney fees, or "inform[ing] the jury" of a party's non-compliance. M. R. Civ. P. 37(c)(1)(C).[13] M. R. Civ. P. 37(b)-(d) embodies a strong preference for liberal imposition of sanctions as necessary and proper to remedy, punish, and deter non-compliance with discovery rules and orders. Peterman , ¶ 17 ; Richardson , ¶¶ 56-57 ; Xu , ¶ 20 ; Owen , 192 Mont. at 276-81, 627 P.2d at 1235-37. Under the abuse of discretion standard, we review the district court's imposition of discovery sanctions for threshold compliance with the provision of M. R. Civ. P. 37 authorizing the sanction, whether a discovery violation or abuse occurred, the extent of prejudice caused by the violation or abuse, and whether the sanction imposed proportionally relates to the nature and effect of the violation or abuse. Hanson v. State , 2016 MT 152, ¶ 17, 384 Mont. 17, 372 P.3d 1281 ; Xu , ¶ 21 ;
***469 Smith v. Butte-Silver Bow Cty. , 276 Mont. 329, 339-40, 916 P.2d 91, 97 (1996). See also Burlington , 239 Mont. at 218-20, 779 P.2d at 892-93 ( M. R. Civ. P. 37 exclusively governs discovery sanctions without resort to inherent power of courts).[14] We generally review lower court findings of fact only for clear error. Findings are clearly erroneous if not supported by substantial evidence, the court misapprehended the effect of the evidence, or we are firmly convinced from our review of the record that the court was mistaken. State v. Warclub , 2005 MT 149, ¶ 23, 327 Mont. 352, 114 P.3d 254 ; Interstate Prod. Credit Ass'n of Great Falls v. DeSaye , 250 Mont. 320, 323, 820 P.2d 1285, 1287 (1991).
General Standards for Merits-Based Sanctions Under M. R. Civ. P. 37(b)-(c).
¶ 21 Extreme sanctions precluding or truncating litigation on the merits (i.e., claim dismissal, default judgment, striking of asserted defenses, or exclusion of evidence) are generally proper only when the predicate discovery abuse is so inexcusable and prejudicial that it outweighs the express preference in M. R. Civ. P. 1 for adjudication on the merits. See Evans v. Scanson , 2017 MT 157, ¶ 20, 388 Mont. 69, 396 P.3d 1284 (affirming admission of expert testimony where brief or incomplete expert disclosure still minimally sufficient to avoid surprise and allow effective cross-examination); Spotted Horse , ¶¶ 37-39 (affirming denial of default liability due to lack of conclusive evidence of intentional or inadvertent destruction of evidence but reversing and remanding for new trial with imposition of more commensurate sanction less prejudicial to non-spoliating party); Cartwright v. Scheels All Sports, Inc. , 2013 MT 158, ¶¶ 27-29, 370 Mont. 369, 310 P.3d 1080 (affirming denial of default judgment based on non-prejudicial destruction of email and computer files pursuant to routine *551 non-litigation-related practice during pendency of disputed unemployment insurance claim); Stokes v. Ford Motor Co. (Stokes II ) , 2013 MT 29, ¶¶ 19-20, 368 Mont. 365, 300 P.3d 648 (affirming denial of default judgment on liability where untimely dump of 300 GB of requested other similar incidents information three weeks before trial not willful, bad faith, or flagrant disregard of rules and orders tantamount to "blatant and systematic" abuse undermining integrity of entire ***470 proceeding); Willson , ¶¶ 27-29 (affirming denial of default judgment based on non-prejudicial destruction of non-chart internal narcotic dosage record pursuant to non-litigation-related records destruction practice during pendency of medical-legal panel review); Kraft v. High Country Motors, Inc. , 2012 MT 83, ¶¶ 30-39, 364 Mont. 465, 276 P.3d 908 (affirming imposition of default judgment based on willful disregard of discovery rules and orders over a three-year period which substantially impaired plaintiff's ability to assess the merits of asserted defenses and necessitated significant cost and delay to obtain discovery that should have been promptly produced in the first place); Peterman , ¶¶ 23-25 (affirming dismissal based on complete failure to produce evidence centrally relevant to damages claim resulting in extreme prejudice regardless of lack of conclusive evidence of bad faith conduct or mere inadvertence); Linn v. Whitaker , 2007 MT 46, ¶¶ 8-12, 24-28, 336 Mont. 131, 152 P.3d 1282 (affirming dismissal based on non-willful but repeated prejudicial failure to provide complete responses to requested medical history essentially relevant to asserted injury claim); Richardson , ¶¶ 58-68 (reversing denial and remanding for entry of default judgment where intentional concealment (by non-response, specious objections, disregard of court order, and last-minute disclosure prior to trial) of unfavorable similar incidents information resulted in "blatant and systematic abuse" that prejudicially "undermined the integrity of the entire proceeding"); Culbertson-Froid-Bainville , ¶¶ 16-19 (affirming order striking defenses in absence of clear evidence of good or bad faith based on complete failure to respond to original discovery requests, obstructive objections in subsequently-compelled responses, and prejudicial "attitude of unresponsiveness to the judicial process"); Xu , ¶¶ 22-31 (affirming dismissal based on material prejudice resulting from complete failure to comply with discovery rules and orders whether willful or not); Smart v. Molinario , 2004 MT 21, ¶¶ 10-14, 319 Mont. 335, 83 P.3d 1284 (affirming dismissal based on intentional prejudicial non-disclosure of unfavorable information centrally relevant to damages claim); Cass v. Composite Indus., Inc. , 2002 MT 226, ¶ 20, 311 Mont. 406, 56 P.3d 322 (affirming default judgment based on repeated prejudicial non-compliance with discovery rules and disregard of court order constituting "flagrant" obstruction of essential discovery); Schuff v. A.T. Klemens & Son , 2000 MT 357, ¶¶ 66, 81, 303 Mont. 274, 16 P.3d 1002 (affirming default judgment on liability based on "willful and in bad faith" non-disclosure of unfavorable evidence centrally relevant to asserted claim); ***471 Maloney v. Home & Inv. Ctr., Inc. , 2000 MT 34, ¶ 36, 298 Mont. 213, 994 P.2d 1124 (affirming default judgment on compensatory and punitive damages claims based on pattern of willful discovery abuse (repeated non-response, incomplete response, disregard of court orders, and last-minute response) ); McKenzie v. Scheeler , 285 Mont. 500, 513-14, 949 P.2d 1168, 1176 (1997) (affirming dismissal based on a "pattern of discovery abuses and disregard of court orders" prejudicially precluding essential discovery); Smith , 276 Mont. at 339-40, 916 P.2d at 97 (reversing dismissal based on incomplete expert disclosure and disregard of discovery order where subject information otherwise available without undue prejudice); Eisenmenger v. Ethicon, Inc. , 264 Mont. 393, 406-07, 871 P.2d 1313, 1321 (1994) (affirming default judgment on liability based on "knowing concealment" of unfavorable expert opinion regarding central issue); Mont. Power Co. v. Wax , 244 Mont. 108, 111-12, 796 P.2d 565, 567 (1990) (affirming exclusion of expert testimony where non-disclosure of requested basis of expert opinion severely impaired effective cross-examination); Jerome , 240 Mont. at 191-93, 783 P.2d at 921-23 (affirming dismissal of claim based on intentional non-disclosure of unfavorable medical history, including unfavorable treating physician causation opinion not correctable without undue cost *552 and delay for critical discovery that plaintiff should have disclosed at the outset); Landauer v. Kehrwald , 225 Mont. 322, 325, 732 P.2d 839, 841 (1987) (affirming dismissal of claim based on repeated discovery violations and disregard of orders regardless of last-minute disclosure); Dassori v. Roy Stanley Chevrolet Co. , 224 Mont. 178, 180-81, 728 P.2d 430, 431-32 (1986) (affirming dismissal of claim based on failure to respond to interrogatories seeking factual basis for asserted claim until sanctions motion hearing); First Bank (N.A.)-Billings v. Heidema , 219 Mont. 373, 375-76, 711 P.2d 1384, 1386 (1986) (affirming default judgment based on willful failure to attend deposition, failure to produce requested documents, and disregard of court orders regarding information centrally relevant to claim at issue); Ewalt v. Scott , 206 Mont. 503, 507, 675 P.2d 77, 79 (1983) (dismissal or default judgment are "extreme sanctions" not permitted absent showing of willful discovery violation or disobedience of court orders); Calaway v. Jones , 191 Mont. 353, 356, 624 P.2d 991, 992 (1981) (dismissal or default judgment are "drastic" sanctions warranted only in "extreme situations" such as intentional failure to respond to interrogatories and appear for depositions).
Application to Merits-Based Spoliation Sanctions.
¶ 22 In contrast to the failure to disclose or produce existing evidence, evidence spoliation is the material alteration, destruction, or failure to ***472 preserve evidence for use by an adversary in pending or future litigation. Guzman v. Jones , 804 F.3d 707, 713 (5th Cir. 2015) ; Silvestri v. Gen. Motors Corp. , 271 F.3d 583, 590 (4th Cir. 2001) ; West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999) ; Rimkus Consulting Grp., Inc. v. Cammarata , 688 F.Supp.2d 598, 612 (S.D. Tex. 2010). As evident in this case, the issue of spoliation arises under M. R. Civ. P. 37 when a party seeks discovery of evidence that no longer exists due to the opposing party's destruction or material alteration of evidence in contemplation of adverse litigation. See M. R. Civ. P. 37(c)(1) (failure to provide or disclose discoverable information); Spotted Horse , ¶ 20 (district courts are "well equipped" under M. R. Civ. P. 37 to address and deal with spoliation).
¶ 23 Sanctionable spoliation occurs only upon the breach of a duty to preserve the subject evidence. Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC , 774 F.3d 1065, 1070 (6th Cir. 2014) ; Micron Tech., Inc. v. Rambus Inc. , 645 F.3d 1311, 1320 (Fed. Cir. 2011) ; Residential Funding Corp. v. DeGeorge Fin. Corp. , 306 F.3d 99, 106-09 (2d Cir. 2002) ; Peschel v. City of Missoula , 664 F.Supp.2d 1137, 1141, 1143-44 (D. Mont. 2009) ; Zubulake v. UBS Warburg LLC , 220 F.R.D. 212, 216 (S.D.N.Y. 2003). By implication, Federal and Montana Rules of Civil Procedure 26 - 37 give rise to a common-law duty to preserve evidence when a party in control knows or reasonably should know that existing items or information may be relevant to pending or reasonably foreseeable litigation. Willson , ¶ 27. See, e.g. , Fujitsu Ltd. v. Fed. Express Corp. , 247 F.3d 423, 436 (2d Cir. 2001) ; Micron , 645 F.3d at 1320 ; Silvestri , 271 F.3d at 590 ; Brookshire Bros . Ltd. v. Aldridge , 438 S.W.3d 9, 20 (Tex. 2014) ; Zubulake , 220 F.R.D. at 216. Consideration of this common-law duty to preserve involves two related inquiries: when the duty arose and the scope of the duty. Brookshire Bros. , 438 S.W.3d at 20 ; Zubulake , 220 F.R.D. at 216. The determination of when litigation became "reasonably foreseeable" is an objective, fact-specific standard "that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." Micron , 645 F.3d at 1320 (citing Fujitsu , 247 F.3d at 436 ). Though the prospect of future litigation need not be "imminent," the mere abstract possibility or fear of future litigation does not alone give rise to a duty to preserve. Micron , 645 F.3d at 1320 ; In re Napster, Inc. Copyright Litig. , 462 F.Supp.2d 1060, 1068 (N.D. Cal. 2006) ; Brookshire Bros. , 438 S.W.3d at 20 ; Zubulake , 220 F.R.D. at 217. When and to what extent litigation becomes ***473 reasonably foreseeable depends upon the unique facts and circumstances of each case.
¶ 24 When adverse litigation becomes reasonably foreseeable, the duty to preserve applies only to then-existing items or information reasonably likely to be relevant *553 to, or likely to lead to the discovery of evidence relevant to, claims or defenses at issue in the contemplated litigation. Willson , ¶ 27 ; Kronisch v. United States , 150 F.3d 112, 126 (2d Cir. 1998) ; Zubulake , 220 F.R.D. at 217-18 ; M. R. Civ. P. 26(b)(1). The duty requires the subject party to take reasonable action to preserve items and information within its scope, including, as pertinent, suspending any routine records or resource retention, destruction, or recycling policy or practice. Willson , ¶ 27 ; Zubulake , 220 F.R.D. at 217-18. See also Fed. R. Civ. P. 37(f) (2006) Advisory Committee Note.
¶ 25 A party seeking the extreme sanction of precluding or truncating litigation on the merits has the burden of showing that: (1) the lost item or evidence was subject to a duty to preserve; (2) the other party intentionally, knowingly, or negligently breached the duty; and (3) the loss was sufficiently prejudicial to outweigh the overarching policy of M. R. Civ. P. 1 for resolution of disputed claims on the merits. See Stokes II , ¶¶ 18-20 (citing Willson, ¶ 28 and Eisenmenger , 264 Mont. at 406, 871 P.2d at 1321 ); Yoder, 774 F.3d at 1070 ; Faas v. Sears, Roebuck, & Co. , 532 F.3d 633, 644-45 (7th Cir. 2008) ; Residential Funding Corp. , 306 F.3d at 108-09 ; Brookshire Bros. , 438 S.W.3d at 20-22. See also Anheuser-Busch, Inc. v. Nat. Beverage Dist. , 69 F.3d 337, 348-49 (9th Cir. 1995) (sanctioning court must balance need for sanctions against "public policy favoring disposition of cases on their merits"); Richardson , ¶ 68 (preference for trial on the merits weighs against default judgment). A breach of a duty to preserve evidence is intentional, willful, or in bad faith only if the party destroyed or failed to preserve evidence with the intent or purpose to conceal unfavorable evidence. Guzman , 804 F.3d at 713 ; Faas , 532 F.3d at 644 ; Mathis v. John Morden Buick, Inc. , 136 F.3d 1153, 1155-56 (7th Cir. 1998) ; Cat3, LLC v. Black Lineage, Inc. , 164 F.Supp.3d 488, 501 (S.D.N.Y. 2016).[15] The court may reasonably infer intentional, willful, or bad faith purpose or intent from direct or circumstantial evidence. See Yoder , 774 F.3d at 1071 ; Residential Funding Corp. , 306 F.3d at 108-09. See also Culbertson-Froid-Bainville, ¶¶ 19-21 (affirming order striking ***474 defenses despite absence of clear evidence of good or bad faith conduct based on complete failure to respond to original discovery requests, obstructive objections in subsequently-compelled responses, dilatory party's "attitude of unresponsiveness to the judicial process").
¶ 26 If the spoliating party intentionally, willfully, or in bad faith destroyed evidence (i.e., with the purpose or intent to conceal unfavorable evidence), a rebuttable presumption arises that the evidence was materially unfavorable to the spoliating party thus resulting in severe prejudice to the other party. See Guzman , 804 F.3d at 713 ; Faas , 532 F.3d at 644 ; Residential Funding Corp. , 306 F.3d at 108-09 ; Nation-Wide Check Corp. v. Forest Hills Dist., Inc. , 692 F.2d 214, 215, 217-20 (1st Cir. 1982). See also Burlington , 239 Mont. at 218, 779 P.2d at 893 (willfulness relevant to choice of sanction). However, merely negligent spoliation does not give rise to a presumption of material prejudice. Faas , 532 F.3d at 644 (bad faith spoliation required for adverse inference instruction); Greyhound Lines, Inc. v. Wade , 485 F.3d 1032, 1035 (8th Cir. 2007) (bad faith required for severe spoliation sanction); Penalty Kick Mgmt. Ltd. v. Coca Cola Co. , 318 F.3d 1284, 1294 (11th Cir. 2003) (material prejudice presumed only upon bad faith spoliation); Turner v. Pub. Serv. Co. , 563 F.3d 1136, 1149-50 (10th Cir. 2009) (mere negligent spoliation insufficient for presumption of material prejudice). Absent a showing of purpose or intent to conceal unfavorable evidence, negligent spoliation is sufficient to warrant a merits-based sanction only upon a showing, by direct or circumstantial evidence, of a reasonable probability that the lost evidence would have materially supported an essential element of a claim or defense at issue. Willson , ¶ 28, Smith , 276 Mont. at 339-40, 916 P.2d at 97. See, e.g., Yoder, 774 F.3d at 1070-71 ; Residential Funding Corp. , 306 F.3d at 108-10 ; Silvestri , 271 F.3d at 593 (dismissal or default justified absent intentional or bad faith only when spoliation "so prejudicial that it substantially denied" the other party the ability to effectively prosecute or defend a claim); Brookshire Bros. , 438 S.W.3d at 22 *554 ("negligent spoliation" insufficient to support merits-based sanction "without some proof about what the destroyed evidence would show"); Zubulake , 220 F.R.D. at 216 (spoliation "germane" only if sufficient to support a reasonable inference that the evidence would have been unfavorable to the spoliating party). See also Stokes II , ¶ 18 ; Cartwright , ¶ 27 ; Culbertson-Froid-Bainville , ¶¶ 16-19. Mere speculation, conjecture, or possibility that negligently-spoliated evidence was materially favorable to the opposing party is insufficient to warrant a severe sanction on the merits. ***475 Wyler v. Korean Air Lines Co. , 928 F.2d 1167, 1174 (D.C. Cir. 1991) (mere innuendo insufficient for presumption that spoliated evidence supports opponent's claim). Accord Stokes II , ¶ 18. Whether material prejudice is presumed or shown, the resulting sanction imposed must be proportional to the prejudice. Spotted Horse , ¶¶ 37-39 ; Anheuser-Busch, Inc. , 69 F.3d at 353-54 (due process requires proportionality); Smith , 276 Mont. at 339-40, 916 P.2d at 97.
Limitation on ESI Spoliation Sanctions- M. R. Civ. P. 37(e).
¶ 27 Against the backdrop of M. R. Civ. P. 37(b)-(c), and as adopted verbatim from former Fed. R. Civ. P. 37(e) (2006)[16] (originally Fed. R. Civ. P. 37(f) ), the intended purpose of M. R. Civ. P. 37(e) was to deal more narrowly with the specific problem of good faith spoliation of electronically-stored information (ESI), to wit:
Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically-stored information lost as a result of the routine, good-faith operation of an electronic information system.
M. R. Civ. P. 37(e) ; Fed. R. Civ. P. 37(f) (2006) Advisory Committee Note. Pursuant to its express terms, M. R. Civ. P. 37(e) is not an independent source of authority for the imposition of sanctions but, rather, a special limitation on the imposition of otherwise available sanctions. See M. R. Civ. P. 37(e) ("[a]bsent exceptional circumstances, a court may not impose sanctions under these rules ..." (emphasis added) ); Fed. R. Civ. P. 37(f) (2006) Advisory Committee Note.[17] However, upon finding the original version of the rule inadequate to "address the serious problems resulting from the continued exponential ***476 growth" in ESI,[18] the Federal Rules *555 Advisory Committee has since revised Fed. R. Civ. P. 37(e) to provide uniform standards for sanctioning ESI spoliation. Fed. R. Civ. P. 37(e) (2015) Advisory Committee Note.[19] Montana has yet to similarly consider the continued efficacy of M. R. Civ. P. 37(e) in its current form.
¶ 28 Fed. R. Civ. P. 37(e) (2015) essentially boils the standards for the ***477 imposition of a merits-based sanction for ESI spoliation down to consideration of: (1) the existence and scope of the duty to preserve evidence (whether, when, and to what extent litigation was reasonably foreseeable and what then-existing information or items were reasonably likely to be relevant to claims or defenses at issue in the contemplated litigation); (2) whether the spoliating party breached the duty by failing to take reasonable action to preserve the subject information or items; (3) whether the lost evidence was materially prejudicial to an essential element of a claim or defense (with material prejudice presumed from evidence of intent or purpose to deprive an adversary of the evidence); and (4) whether the sanction imposed is reasonably proportional to the material prejudice presumed or shown (with recognition that an appropriate sanction need not necessarily "cure every possible prejudicial effect"). See Fed. R. Civ. P. 37(e) (2015) Advisory Commission Note. Though we have not heretofore had the opportunity to construe M. R. Civ. P. 37(e), the foregoing duty, breach, prejudice, and proportionality standards incorporated into Fed. R. Civ. P. 37(e) (2015) are largely consistent with: (1) the substantive essence of M. R. Civ. P. 37(e) in current form; (2) our precedent under M. R. Civ. P. 37(b)-(d) ; and (3) the weight of federal precedent from which the new federal rule derived. We will therefore construe and apply M. R. Civ. P. 37(e) in the context of the foregoing duty, breach, prejudice, and proportionality analysis.[20]
MSU's ESI Spoliation.
¶ 29 The District Court imposed a severe sanction on the merits (default judgment on liability) against MSU based on its failure to preserve certain faculty and music student email communications that may have existed on the MSU email server and faculty-assigned computers regarding Komiyama and his interactions with music students. The sanctions order specifically pertained to unpreserved emails associated with the MSU email accounts of Komiyama, Komiyama music students, and former MSU employees Leech, Bentz, Agre-Kippenham, and Letendre. Though it did not make particularized findings of fact and conclusions of law, the District Court characterized the unpreserved email information as potentially relevant to substantiate Cepeda's assertion that MSU was or should have been ***478 aware, no later than the 2009 Student M complaint, that Komiyama posed a risk of subjecting his students to sexually-oriented tortious conduct rather than sometime between the end of 2010 and Spring 2011 as asserted by MSU. The District Court was particularly troubled by what it characterized as MSU's "systematic removal of all email accounts of its professors, students, and Komiyama," thus allowing MSU to "create a void of communications *556 between" those individuals "save for what MSU alone determined to keep."
¶ 30 MSU made an unrebutted evidentiary showing regarding the routine operation of its email server, personal computer systems, and non-litigation-related IT management practices. IT personnel routinely deleted employee email accounts from the MSU email server upon termination of employees from MSU. Prior to redeployment, IT personnel similarly deleted any personal email and files left behind on computers previously assigned to departed faculty. Deleted emails were nonetheless briefly recoverable from the MSU email server and personal computer storage media until automatically overwritten by system demands in the ordinary operation of those systems. Pursuant to the ordinary, non-litigation-related operation and administration of MSU's IT systems, any residual emails still present on the MSU email server or faculty-assigned computers in relation to a faculty email account were usually irrecoverably lost within a short time after the employee left MSU.
¶ 31 As a matter of law, MSU had a duty to interrupt its routine IT operations and practices if and when it became reasonably foreseeable that it would likely be subject to an adverse legal claim based on Komiyama's sexually-oriented conduct toward Cepeda or other music students. Upon such occurrence, the duty required MSU to preserve any then-existing faculty and student email communications that would likely be relevant, or reasonably likely to lead to discovery of information relevant, to such claim or related defense. Based on the June 15, 2011 records preservation notice, the District Court found that MSU "was on notice that litigation was foreseeable concerning Komiyama and his relationships with his students." We agree. MSU thereafter had a duty to preserve any then-existing email communications relevant to, or reasonably likely to lead to discovery of information relevant to, sexually-oriented conduct by Komiyama toward Cepeda or other music students.
¶ 32 However, Assistant A&A Dean Bentz left MSU over a year before MSU received Cepeda's tort claim notice and MSU's subsequent issuance of the related records preservation notice on June 15, 2011.
***479 Based on MSU's unrebutted showing, there is no evidentiary basis upon which to reasonably conclude or suspect that emails associated with Bentz's email account, other than those preserved by MSU and subsequently disclosed to Cepeda, still existed on the MSU email server or Bentz's office computer on June 15, 2011. Thus, contrary to the District Court's implicit finding, MSU's failure to preserve the email account or office computer files of Assistant A&A Dean Bentz did not constitute a breach of a preservation duty because the duty did not arise until over a year later.
¶ 33 More troublesome is MSU's failure to preserve all emails associated with the email accounts of Leech, Agre-Kippenham, Letendre, and Komiyama music students other than Cepeda, that may have existed on the MSU email server or faculty computers on June 15, 2011. Apart from an unverifiable, self-serving showing that they likely contained no relevant information other than as referenced in emails retained pursuant to its internal investigation, MSU's affidavit showings, through in-house counsel, were at best vague or ambiguous as to when unpreserved emails associated with the MSU accounts of Leech, Agre-Kippenham, and Letendre were in fact irrecoverably lost. Further, other than a showing that Komiyama and Cepeda primarily, if not exclusively, communicated by private email, MSU made no particularized evidentiary showing in response to Cepeda's sanctions motion as to whether and to what extent, if any, emails associated with MSU email server accounts assigned to Komiyama music students would still have been present on the MSU server on June 15, 2011.[21]
*557 Though Leech and Agre-Kippenham retired in May 2011, MSU's measured evidentiary showing and arguments evince tacit acknowledgment that it did not preserve all of the emails associated with the MSU accounts of Leech, Agre-Kippenham, and then-still-active Letendre that existed on June 15, 2011. Substantial evidence thus supports the District Court's finding that MSU retained only the ***480 faculty and student emails that it deemed relevant to its internal investigation. Based on MSU's vague and ambiguous evidentiary showing, we cannot say that the District Court's implicit finding-that MSU breached a duty to take reasonable action to preserve information at least potentially relevant to a reasonably foreseeable adverse claim-was clearly erroneous.
¶ 34 However, the balance of the District Court's sanctions analysis is more problematic. Without any predicate finding, the court insinuated that MSU failed to preserve the entirety of the subject faculty and student emails in bad faith, i.e., with the intent or purpose of concealing unfavorable evidence. Except for disputable evidence of a breach of a duty to preserve the entirety of music department faculty and student emails, neither the District Court nor Cepeda have cited any non-speculative direct or circumstantial evidence indicating that MSU knowingly failed to preserve any potentially relevant student or faculty email communications with the purpose or intent of concealing unfavorable evidence. To the contrary, MSU's failure to preserve occurred in the midst of MSU's own aggressive investigation of Komiyama at a time when the decision to reinstate or terminate him from employment hung in the balance. The only real-time assessment reasonably supported by the limited record before us was that MSU was actively searching for evidence manifesting the propriety or impropriety of Komiyama's conduct and relationships with students, including Cepeda, in the face of serious and already significantly-substantiated allegations of misconduct. Beyond rank speculation and conjecture, neither the District Court nor Cepeda cited any substantial direct or circumstantial evidence that would support a finding or inference that MSU knowingly failed to preserve evidence with purpose or intent to conceal unfavorable evidence.
¶ 35 Seemingly recognizing the infirmity of its insinuation of bad faith, the District Court in any event found that MSU's failure to preserve faculty and student emails, other than those deemed relevant to its internal investigation, "irreparably damage[d] Cepeda's ability to present her claims." Absent direct or circumstantial evidence of purpose or intent to destroy unfavorable evidence, dismissal or default judgment is a proper spoliation sanction under M. R. Civ. P. 37(b)-(e) only upon a finding of a substantial likelihood that the lost or destroyed evidence would have been materially relevant to an essential element of a claim or defense at issue and not substantially cumulative of other available evidence. See Stokes II , ¶¶ 18-20 (citing Willson, ¶ 28 and Eisenmenger , 264 Mont. at 406, 871 P.2d at 1321 ). Here, neither ***481 the District Court nor Cepeda cited any non-speculative basis upon which to conclude or suspect that any substantial likelihood existed that any of the unpreserved email communications which may have existed on June 15, 2011, would actually have been materially favorable to Cepeda. The District Court's contrary finding is supported by nothing more than pure speculation and conjecture.
¶ 36 In contrast, MSU timely produced in excess of 1,700 pages of documentary discovery including all of the information initially compiled by Leech and subsequently gathered in MSU's extensive internal investigation. MSU made an unrebutted evidentiary showing that co-investigator Letendre had no involvement with Komiyama or related student complaints prior to her involvement in MSU's internal investigation. Cepeda thoroughly deposed Bentz, Leech, and Agre-Kippenham about their relevant involvement, knowledge, and communications in this matter. Cepeda had the opportunity to similarly depose Komiyama but did not. In her response in opposition to Cepeda's petition for supervisory control, Cepeda does not assert that Student M, Professor Biber, or any other MSU faculty member or Komiyama music student likely to have knowledge of pre-2010 *558 Komiyama misconduct were no longer available for interview or deposition during the discovery period in the underlying matter.
¶ 37 Under these circumstances, Cepeda has lost no more than the opportunity to comb through every single email communication to or from Komiyama, Komiyama music students, Leech, Bentz, Agre-Kippenham, and Letendre that might possibly have existed on June 15, 2011, and then might possibly have referenced Komiyama in some fashion, whether relevant or not. Cepeda has nonetheless had a full and fair opportunity to discover all known, materially-relevant documentary evidence that likely existed on June 15, 2011, regarding MSU's prior awareness of Komiyama misconduct. No non-speculative basis exists upon which to believe that MSU's failure to preserve every email communication that may have existed on June 15, 2011, caused the loss of a smoking gun or any other documentary information materially favorable to Cepeda or even otherwise substantially different from the information and evidence already available.
¶ 38 The District Court analogized the spoliation in this case to the materially-prejudicial spoliation in Spotted Horse v. BNSF. In Spotted Horse , we reversed a defense verdict and remanded for a new trial with imposition of a sanction "commensurate with" the prejudice that resulted from the railroad's failure to preserve workplace video surveillance highly probative of the accident at issue.
***482 Spotted Horse , ¶¶ 32-39. Despite its sophisticated awareness of the nature, frequency, and likelihood of a resulting FELA[22] claim after a workplace injury, the railroad allowed its video surveillance system to automatically overwrite a number of digital recordings of the accident scene after two supervisory employees viewed and found "nothing significant" about a brief portion of one that depicted the plaintiff's work stall at or near the time of the claimed injury. Spotted Horse , ¶¶ 27-28. Unlike here where only a mere possibility exists that the unpreserved emails might have contained relevant information, the lost evidence at issue in Spotted Horse was unquestionably materially relevant to the extent that it could have shown the exact time and location of the accident, the condition of the accident scene, the manner or means in which the plaintiff was working at the time, and the plaintiff's immediate post-accident condition and manner. Spotted Horse , ¶ 32. In essence, we held that the railroad prejudicially breached a duty to preserve materially-relevant evidence. See Spotted Horse , ¶¶ 37-39.
¶ 39 Contrary to the District Court's reasoning, Spotted Horse is not an analogous example of circumstances under which a default judgment is a proper spoliation sanction. In fact, in that case we actually affirmed the district court's denial of the plaintiff's motion for default judgment due to the lack of conclusive evidence of bad or good faith. Spotted Horse , ¶ 39. We subsequently reversed and remanded only because the sanction imposed by the court (barring the railroad from referencing the fact or contents of the lost videos as long as the plaintiff remained silent) unfairly rewarded the destruction of preservable evidence by forcing the plaintiff to choose between remaining silent, and thereby allowing the railroad to assert that no evidence supported his claim or, alternatively, exposing the highly suspicious destruction of evidence, but thereby allowing the railroad to present irrefutable self-serving testimony that the lost evidence was favorable to the railroad. Spotted Horse , ¶¶ 37-39. Spotted Horse is analogous to this case only to the extent that both cases essentially involved findings of a breach of duty to preserve evidence. Unlike in Spotted Horse , here there is no non-speculative basis upon which to conclude that MSU's failure to preserve the subject emails resulted in material prejudice to Cepeda. Spotted Horse is clearly distinguishable here.
¶ 40 Except for insignificant differences, the circumstances of this case are most analogous to those in Cartwright and Willson . Though ***483 we did not expressly apply a duty, breach, prejudice, and proportionality analysis in those cases, Cartwright and Willson essentially involved similar asserted breaches of a duty to preserve evidence, based on the failure to interrupt routine non-litigation related *559 data and records retention operations, but under circumstances where default judgment would not have been proportional to the nature and extent of the resulting prejudice. See Cartwright , ¶ 27 (affirming denial of default judgment based on routine deletion of email and computer files during pendency of disputed unemployment insurance claim), and Willson , ¶¶ 27-29 (affirming denial of default judgment based on routine destruction of secondary, non-chart internal narcotic dosage record during pendency of medical-legal panel review). Similarly, here, though the District Court's implicit finding that MSU breached a duty to preserve potentially relevant information by failing to interrupt its routine IT operations and practices is not clearly erroneous, no cited substantial evidence manifests either a purpose or intent to conceal unfavorable evidence or a likelihood of resulting material prejudice in any event. Thus, as in Cartwright and Willson , default judgment is not reasonably proportional to the nature and extent of the breach of duty and any resulting prejudice. We hold that the District Court abused its discretion in imposing default judgment against MSU as a spoliation sanction under M. R. Civ. P. 37(b)-(c) and (e).
CONCLUSION
¶ 41 We hold that exercise of supervisory control is necessary and proper on the ground that this case presents a significant question as to whether the District Court is proceeding under a mistake of law which, if uncorrected prior to final judgment, will likely cause significant injustice rendering ordinary appeal inadequate. Upon extraordinary review, we hold that the District Court abused its discretion in imposing default judgment against MSU as a spoliation sanction under M. R. Civ. P. 37(b)-(c) and (e). We therefore reverse that portion of the District Court's sanctions order and remand for further proceedings in the ordinary course.
¶ 42 Reversed and Remanded.
We concur:
MIKE McGRATH, C.J.
JAMES JEREMIAH SHEA, J.
BETH BAKER, J.
INGRID GUSTAFSON, J.

Cepeda's response to MSU's petition for supervisory control characterizes this as a "negligent hiring, retention, and supervision case."

MSU further petitions for exercise of supervisory control over the portion of the District Court's April 11, 2018 order denying MSU's cross-motion for Rule 37 sanctions against Cepeda. MSU asserts that Cepeda destroyed or otherwise concealed unfavorable email communications and text messages previously present on her private Gmail account and cell phone. Upon review of MSU's petition and Cepeda's response, we decline to exercise supervisory control on the basis that MSU has failed to sufficiently demonstrate that ordinary appeal will be inadequate to address the asserted mistake of law.

It is unclear from the limited record presented as to Puffer's precise administrative capacity.

A copy of Leech's timeline is also attached of record as Exhibit C to MSU's Brief in Opposition to Cepeda's Motion for Sanctions (Dkt. 115) in the underlying matter.

Though unclear from the record presented when MSU first became aware, Komiyama apparently was a registered sex offender at the time of hiring based on a 1990 California conviction, at age 22, for felony sexual contact with a sixteen-year-old girl.

Leslie Taylor was MSU's chief in-house legal counsel. Pam Merrell was associate legal counsel under Taylor's supervision.

Leech's timeline states that he did not know that Komiyama had actually been convicted of a sex crime in California, and that he was thus required to register as a sex offender, until reading about those facts in a Bozeman Daily Chronicle story on June 11, 2015. His timeline asserts that a subsequent Montana Human Rights Bureau investigative report mistakenly stated that Leech told the investigator that he first became aware of Komiyama's California conviction in February 2011 but that he was then aware only that Komiyama had been previously charged with a sex crime.

See § 2-9-301, MCA (requirement for advance tort claim notice to State of Montana).

It is unclear on the limited record presented who received the notice and when.

On July 8, 2011, Merrell emailed co-investigator Letendre directing her to similarly preserve their accumulated internal investigation records.

See §§ 49-2-101 through -602, MCA (mandatory administrative remedy for illegal discrimination claims).

In granting this petition, we reiterate that pretrial discovery disputes are typically not appropriate for exercise of supervisory control. It is not our place "to micromanage discovery or perform exhaustive document review on supervisory control." BNSF Ry. Co. v. Mont. Eighth Judicial Dist. Court , No. OP 11-0114, Or., 360 Mont. 546, 264 P.3d 127 (Mont. March 17, 2011). We will nonetheless sparingly exercise supervisory control over interlocutory discovery matters when required under truly extraordinary circumstances where the lower court is proceeding under a demonstrable mistake of law and the failure to do so "will place a party at a significant disadvantage in litigating the merits of the case." Hegwood v. Mont. Fourth Judicial Dist. Court , 2003 MT 200, ¶ 6, 317 Mont. 30, 75 P.3d 308 (citing State ex rel. Burlington N. R.R. v. Mont. Eighth Judicial Dist. Court, 239 Mont. 207, 212, 779 P.2d 885, 889 (1989) ).

Unlike M. R. Civ. P. 37(b) (sanction for failure to comply with court order), a violation of a court order is not a necessary prerequisite to the imposition of sanctions under M. R. Civ. P. 37(c)(1). For similar distinction between M. R. Civ. P. 37(b) and 37(d), see Jerome v. Pardis , 240 Mont. 187, 191, 783 P.2d 919, 921 (1989) (noting similar distinction between) and Burlington, 239 Mont. at 218-19, 779 P.2d at 893.

If the court specifically warned a party about the consequences of a discovery violation or abuse, we further review whether the sanction imposed was consistent with the court's warning. Culbertson-Froid-Bainville Health Care Corp. v. JP Stevens & Co. Inc. , 2005 MT 254, ¶ 15, 329 Mont. 38, 122 P.3d 431.

Similarly, see Fed. R. Civ. P. 37(e)(2) (2015).

See 2011 M. R. Civ. P. 37 Advisory Notes.

See also M. R. Civ. P. 26(b)(2)(B) and Fed. R. Civ. P. 26(b)(2)(B) further providing that:
[a] party need not provide discovery of [ESI] from sources that the party identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

Though intended to provide a "safe harbor" for good faith destruction of ESI, federal courts effectively read the intended "safe harbor" out of Fed. R. Civ. P. 37(e) (2006) by generally concluding "that once the duty to preserve arises-and it arises as soon as litigation becomes foreseeable-any deletion of relevant data is, by definition, not in good faith." Robert Hardaway et. al., E-Discovery's Threat to Civil Litigation: Reevaluating Rule 26 for the Digital Age , 63 Rutgers L. Rev. 521, 566-86 (2011). For detailed discussion of the friction between the need to preserve ESI for litigation use and the legitimate business need to dispose of unnecessary ESI, the identified shortcomings of Fed. R. Civ. P. 37(e) (2006), and the impetus for the 2015 revision of Fed. R. Civ. P. 37(e), see , e.g. , Robert Hardaway, et al., E-Discovery's Threat to Civil Litigation: Reevaluating Rule 26 for the Digital Age, 63 Rutgers L. Rev. 521 (2011) ; Dan H. Willoughby, Jr., et al., Sanctions for E-Discovery Violations: By the Numbers , 60 Duke L.J. 789, 790 (2010) (prevalence of discoverable ESI, related preservation uncertainties and costs, and risk of spoliation sanctions at an unprecedented high); Nicole D. Wright, Note, Federal Rule of Civil Procedure 37(e): Spoiling the Spoliation Doctrine , 38 Hofstra L. Rev. 793, 806 (2009) (in re problem of ESI spoliation "[i]n a world where the very act of deletion is integral to normal operations" and unfairness of treating "the inadvertent or negligent loss of [ESI] as indicative of intent to destroy evidence"); Fed. R. Civ. P. 37(e) (2015) Advisory Committee Note. Accord 8B Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2284.1, 44 (3d ed. Supp. 2018) (the limited 2006 rule "has not adequately addressed the serious problems resulting from the continued exponential growth" of ESI). See also Cedars-Sinai Med. Ctr. v. Superior Court , 18 Cal.4th 1, 74 Cal.Rptr.2d 248, 954 P.2d 511, 519 (1998) ("risk of erroneous spoliation liability" imposes "indirect costs by causing persons or entities to take extraordinary measures to preserve for an indefinite period documents and things of no apparent value solely to avoid the possibility of spoliation liability if years later those items turn out to have some potential relevance to future litigation").

The 2015 version of Fed. R. Civ. P. 37(e) provides:
Failure to Preserve Electronically[-]Stored Information. If electronically[-]stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court: (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may: (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment.

The "good faith" and "exceptional circumstances" considerations referenced in M. R. Civ. P. 37(e) are necessarily subsumed into the prejudice and proportionality elements of the analysis.

MSU inexplicably failed to specifically respond to Cepeda's District Court briefing assertion that Komiyama's 2011 music students were readily identifiable and that MSU could and should have preserved the contents of their MSU email accounts at least as of June 15, 2011. Given the potential gravity of Cepeda's sanctions motion, and the IT and administrative knowledge presumably available to MSU, we share the District Court's frustration with the unexplained reason why MSU did not make a more particularized showing in opposition to Cepeda's motion as to whether and to what extent, if any, the subject class of music student and faculty emails existed on the MSU email server or faculty-assigned computers on June 15, 2011.

Federal Employers Liability Act.